# CHAFFIN *v.* STYNCHCOMBE, SHERIFF

No. 71–6732.   Argued February 22, 1973—Decided May 21, 1973

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, and REHNQUIST, JJ., joined. DOUGLAS, J., filed a dissenting statement, *post,* p. 35. STEWART, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post,* p. 35. MARSHALL, J., filed a dissenting opinion, *post,* p. 38.

*Glenn Zell,* by appointment of the Court, 409 U. S. 1123, argued the cause and filed a brief for petitioner.

*Richard E. Hicks* argued the cause for respondent.   On the brief were *Lewis R. Slaton, Joel M. Feldman,* and *Carter Goode.\**

---

*\*David M. Pack,* Attorney General, *pro se,* and *Bart C. Durham,* Assistant Attorney General, filed a brief for the Attorney General of Tennessee as *amicus curiae.*

MR. JUSTICE POWELL delivered the opinion of the Court.

A writ of certiorari was granted in this case to consider whether, in those States that entrust the sentencing responsibility to the jury, the Due Process Clause of the Fourteenth Amendment bars the jury from rendering higher sentences on retrials following reversals of prior convictions. In *North Carolina* v. *Pearce*, 395 U. S. 711 (1969), this Court established limitations on the imposition of higher sentences by judges in similar circumstances. While we reaffirm the underlying rationale of *Pearce* that vindictiveness against the accused for having successfully overturned his conviction has no place in the resentencing process, whether by judge or jury, we hold today that due process of law does not require extension of *Pearce*-type restrictions to jury sentencing.

## I

Early in 1969, petitioner was tried by a jury in a Georgia state criminal court on a charge of robbery by open force or violence, a capital offense at that time. The jury, which had been instructed that it was empowered to impose a sentence of death, life imprisonment, or a term of years,[1] found petitioner guilty and sentenced him to 15 years in prison. He appealed to the Georgia Supreme Court, claiming primarily that the trial judge had given an erroneous jury instruction as to the

---

[1] Petitioner was indicted under a statute that provided for the following range of punishments:

"Robbery by open force or violence shall be punished by death, unless the jury recommends mercy, in which event punishment shall be imprisonment in the penitentiary for life: Provided, however, the jury in all cases may recommend that the defendant be imprisoned in the penitentiary for not less than four years nor longer than 20 years, in the discretion of the court." Ga. Code Ann. § 26-2502 (1935), replaced by Ga. Code Ann. § 26-1902 (1972).

defendant's burden of proving an alibi defense. His claim was rejected and his conviction was affirmed. 225 Ga. 602, 170 S. E. 2d 426 (1969). Thereafter, he renewed that claim in a petition for a writ of habeas corpus to the United States District Court for the Northern District of Georgia. The District Court found petitioner's contention meritorious, granted the writ, and ordered him returned to the state court for retrial.

Upon retrial before a different judge and a new jury, petitioner was again found guilty. A comparison of the trial transcripts in the two cases indicates that the trials were similar in most respects. The case was prosecuted on both occasions by the same State's attorney and the same prosecution witnesses testified to the facts surrounding the alleged robbery. Petitioner, however, was represented by new counsel and, in addition to repeating his alibi defense, he interposed an insanity defense not offered at the former trial. New witnesses were called to testify for both sides on this issue. Also, while petitioner took the stand and made an unsworn statement in each case, his statement at the latter trial was longer and contained autobiographical information not presented to the former jury, including an emotional discussion of his family background, an account of his religious affiliation, job history, previous physical injuries, and a rendition of several religious poems and songs he had written.[2]

The jury instructions on the permissible range of punishment were the same at each trial and the prosecutor at the second trial urged the jury to sentence petitioner to death, as he had in his closing argument at the prior trial.[3] This time, however, the jury returned a sentence

---

[2] For a detailed description of the unique unsworn-statement practice in Georgia see *Ferguson* v. *Georgia*, 365 U. S. 570 (1961).

[3] During oral argument in this Court, counsel disagreed as to whether the prosecutor asked for the death penalty at the first

of life imprisonment. The parties agree that the jury was not aware of the length of the sentence meted out by the former jury. And, although the jury was informed by one of petitioner's own witnesses that he had been tried previously on the same charge,[4] the jury was not told that petitioner had been convicted and that his conviction had been overturned on collateral attack.[5]

Claiming primarily that it was improper for the State to allow the jury to render a harsher sentence on retrial, petitioner appealed again to the State Supreme Court. That court affirmed the lower court's judgment and refused to alter petitioner's sentence. 227 Ga. 327, 180 S. E. 2d 741 (1971). He then filed his second application for habeas relief in the Federal District Court, arguing that the higher sentence was invalid under *Pearce*.

---

trial. Tr. of Oral Arg. 13, 26, 32–33. At the Court's request, counsel have filed post-argument affidavits on this question. Although the closing arguments themselves were not transcribed, the State prosecutor states that, while his memory is not entirely clear on the matter, his notes indicate, and his customary practice suggests, that he asked for the death sentence at both trials. Any remaining doubt is foreclosed by the affidavit filed by the attorney who represented petitioner during the first trial. He states unequivocally that the prosecutor argued "vigorously" in favor of imposition of the death penalty during the closing argument in that trial.

[4] During the second trial, petitioner's counsel from the first trial was called to testify in petitioner's behalf in support of his insanity defense. The substance of his testimony was that he had an ample opportunity to study petitioner during the previous proceedings and that he was convinced that petitioner was suffering from a "mental defect." He explained that, despite his own evaluation, he acquiesced in petitioner's request that he not interpose an insanity defense at that time.

[5] At the most, then, the jury might have speculated as to whether petitioner's retrial was the product of a mistrial or of a reversal of a prior conviction. Indeed, counsel for respondent indicated at oral argument that Georgia has many more retrials occasioned by mistrials than retrials following conviction reversals. Tr. of Oral Arg. 38.

The District Court disagreed and declined to issue the writ. On appeal to the United States Court of Appeals for the Fifth Circuit, the District Court's judgment was affirmed in an opinion holding that the higher sentence received in this case was not violative of due process. 455 F. 2d 640 (1972). Because two other federal courts of appeals had held to the contrary that *Pearce* restrictions are applicable,[6] we granted certiorari to resolve the conflict. 409 U. S. 912 (1972).

## II

Georgia is one of a small number of States that entrust the sentencing function in felony cases to the jury rather than to the judge.[7] While much has been written on the questions whether jury sentencing is desirable [8] and whether it is compatible with the modern philosophy of criminal sentencing that "the punishment should fit the offender and not merely the crime," *Williams* v. *New*

---

[6] Compare the Fifth Circuit opinion in the instant case (455 F. 2d 640 (1972)), and *Casias* v. *Beto,* 459 F. 2d 54 (CA5 1972), with *Levine* v. *Peyton,* 444 F. 2d 525 (CA4 1971), and *Pendergrass* v. *Neil,* 456 F. 2d 469 (CA6 1972) (pet. for cert. pending, No. 71–1472). State court decisions on this question appear uniformly to hold *Pearce* inapplicable to jury resentencing. See cases discussed in Aplin, Sentence Increases on Retrial After *North Carolina* v. *Pearce,* 39 U. Cin. L. Rev. 427, 430–432 (1970).

[7] Georgia is one of 12 States that provide for jury sentencing in at least some categories of noncapital felony cases. Aplin, *supra,* n. 6, at 429 and n. 10.

[8] See, *e. g.,* Stubbs, Jury Sentencing in Georgia—Time For a Change?, 5 Ga. St. B. J. 421 (1969); Note, Jury Sentencing in Virginia, 53 Va. L. Rev. 968 (1967); President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 145 (1967), and American Bar Association Project on Standards for Criminal Justice, Sentencing Alternatives and Procedures § 1.1 (Approved Draft 1968) (both recommending the abolition of jury sentencing).

*York,* 337 U. S. 241, 247 (1949), this Court has never expressed doubt about the constitutionality of that practice. See *McGautha* v. *California,* 402 U. S. 183, 196–208 (1971); *Witherspoon* v. *Illinois,* 391 U. S. 510, 519–520 and n. 15 (1968); *Spencer* v. *Texas,* 385 U. S. 554, 560 (1967); *Giaccio* v. *Pennsylvania,* 382 U. S. 399, 405 n. 8 (1966). The States have always enjoyed "wide leeway in dividing responsibility between judge and jury in criminal cases." *Spencer* v. *Texas, supra,* at 560. If a State concludes that jury sentencing is preferable because, for instance, it guarantees the maintenance of a "link between contemporary community values and the penal system," *Witherspoon* v. *Illinois, supra,* at 519 n. 15, or because "juries are more likely to act with compassion, fairness, and understanding than the judge," Stubbs, Jury Sentencing in Georgia—Time For a Change?, 5 Ga. St. B. J. 421, 426 (1969), nothing in the Due Process Clause of the Fourteenth Amendment intrudes upon that choice.

Petitioner does not question this proposition. Instead, he contends that, although the jury may set the sentence, its range of discretion must be subjected to limitations similar to those imposed when the sentencing function on retrial is performed by the judge. While primary reliance, therefore, is placed on this Court's recent opinion in *Pearce,* petitioner asserts three distinct due process claims: (A) higher sentences on retrial violate the double jeopardy provision of the Fifth Amendment, made binding on the States through the Due Process Clause of the Fourteenth Amendment, *Benton* v. *Maryland,* 395 U. S. 784, 793–796 (1969); (B) higher sentences occasioned by vindictiveness on the part of the sentencing authority violate traditional concepts of fairness in the criminal process; and (C) the possibility of a higher sentence, even absent a reasonable fear of vindictiveness,

has an impermissible "chilling effect" on the exercise of the rights to appeal and to attack collaterally a conviction. Each claim will be considered separately.

## A

The question presented in *Pearce,* arising in the context of judicial resentencing, was framed as follows: "When at the behest of the defendant a criminal conviction has been set aside and a new trial ordered, to what extent does the Constitution limit the imposition of a harsher sentence after conviction upon retrial?" 395 U. S., at 713. In addressing first the double jeopardy claim, the Court recognized the long-accepted power of a State "to *retry* a defendant who has succeeded in getting his first conviction set aside," *id.,* at 720 (emphasis in original); *United States* v. *Tateo,* 377 U. S. 463 (1964), and, as a "corollary" of that power, "to impose whatever sentence may be legally authorized, whether or not it is greater than the sentence imposed after the first conviction." 395 U. S., at 720.

The foundational precedent from which the Court's view of resentencing discretion derives is *Stroud* v. *United States,* 251 U. S. 15 (1919), a case which, because it involved jury resentencing, is central to the double jeopardy claim in the present case. Robert Stroud, popularly known as "The Birdman of Alcatraz," [9] was indicted for the murder of a federal prison guard at Leavenworth, Kansas. After being convicted and sentenced by a jury to life imprisonment, he won a retrial upon a confession of error by the Solicitor General. His retrial resulted in another verdict of guilty of murder in the first degree

---

[9] See T. Gaddis, Birdman of Alcatraz (1955); R. Stroud, Diseases of Canaries (1935); R. Stroud, Digest on the Diseases of Birds (1939); *Stroud* v. *United States,* 283 F. 2d 137 (CA10 1960), cert. denied, 365 U. S. 864 (1961).

and a sentence, again imposed by the jury, of death. On a direct appeal, a unanimous Court held that despite the harsher sentence on retrial Stroud had not been "placed in second jeopardy within the meaning of the Constitution." *Id.,* at 18.

The Court in *Pearce* reaffirmed that decision, emphasizing that it now constitutes a " 'well-established part of our constitutional jurisprudence' " which rests on the "premise that the original conviction has, at the defendant's behest, been wholly nullified and the slate wiped clean." 395 U. S., at 720–721. Petitioner, relying on the views of MR. JUSTICE DOUGLAS and Mr. Justice Harlan expressed in their separate opinions in *Pearce, id.,* at 726, 744, urges the Court to overrule *Stroud,*[10] a step which, for the reasons stated in *Pearce,* we again decline to take.

## B

Petitioner's second contention focuses on the problem of vindictiveness. In *Pearce* it was held that vindictiveness, manifesting itself in the form of increased sentences upon conviction after retrial, can have no place in the resentencing process. Under our constitutional system it would be impermissible for the sentencing authority to mete out higher sentences on retrial as punishment for those who successfully exercised their right to appeal, or to attack collaterally their conviction.[11] Those actually subjected to harsher resentencing as a conse-

---

[10] Brief for Petitioner 9; Tr. of Oral Arg. 40–41.

[11] While there is no *per se* constitutional right to appeal, this Court has frequently held that once a State establishes an appellate forum it must assure access to it upon terms and conditions equally applicable and available to all. *North Carolina* v. *Pearce,* 395 U. S. 711, 724 (1969); *Griffin* v. *Illinois,* 351 U. S. 12 (1956); *Douglas* v. *California,* 372 U. S. 353 (1963); *Rinaldi* v. *Yeager,* 384 U. S. 305 (1966). See also *Johnson* v. *Avery,* 393 U. S. 483 (1969).

quence of such motivation would be most directly injured, but the wrong would extend as well to those who elect not to exercise their rights of appeal because of a legitimate fear of retaliation. Thus, the Court held that fundamental notions of fairness embodied within the concept of due process required that convicted defendants be "freed of apprehension of such a retaliatory motivation." *Id.*, at 725. To that end, the Court concluded that "whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear." *Id.*, at 726. And, as a further prophylaxis, it was stated that those reasons must be based upon "objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding." *Ibid.*

Petitioner seeks the extension of the *Pearce* rationale to jury sentencing. That decision, as we have said, was premised on the apparent need to guard against *vindictiveness* in the resentencing process. *Pearce* was not written with a view to protecting against the mere possibility that, once the slate is wiped clean and the prosecution begins anew, a fresh sentence may be higher for some valid reason associated with the need for flexibility and discretion in the sentencing process. The possibility of a higher sentence was recognized and accepted as a legitimate concomitant of the retrial process. *Id.*, at 723.

Subsequent cases have dispelled any doubt that *Pearce* was premised on the hazard of vindictiveness. In *Moon* v. *Maryland*, 398 U. S. 319 (1970), a case granted with a view to determining the retroactivity of *Pearce*, the Court ordered the case dismissed as improvidently granted when it became clear that there was no claim there that the higher sentence received on retrial was

a product of vindictiveness on the part of the sentenc-
ing judge. Because counsel for the reconvicted de-
fendant eschewed that contention, the Court held that
"there is no claim in this case that the due process stand-
ard of *Pearce* was violated." *Id.,* at 320. A similar
focus on actual vindictiveness is reflected in the decision
last Term in *Colten* v. *Kentucky,* 407 U. S. 104 (1972).
The question in that case was whether the *Pearce* prin-
ciple applied to bar the imposition of a higher sentence
after a *de novo* trial in those jurisdictions that employ
a two-tier system of trial courts. While noting that
"[i]t may often be that the [*de novo* "appeal" court]
will impose a punishment more severe than that re-
ceived from the inferior court," *id.,* at 117, we were shown
nothing to persuade us that "the hazard of being *penalized*
for seeking a new trial, which underlay the holding of
*Pearce,* also inheres in the *de novo* trial arrangement."
*Id.,* at 116 (emphasis supplied). In short, the Due
Process Clause was not violated because the "possibility
of vindictiveness" was not found to inhere in the two-
tier system. *Ibid.*

This case, then, is controlled by the inquiry into pos-
sible vindictiveness counseled by *Pearce, Moon,* and
*Colten.* The potential for such abuse of the sentenc-
ing process by the jury is, we think, *de minimis* in a
properly controlled retrial. The first prerequisite for
the imposition of a retaliatory penalty is knowledge
of the prior sentence. It has been conceded in this
case that the jury was not informed of the prior sen-
tence. We have no reason to suspect that this is not
customary in a properly tried jury case. It is more likely
that the jury will be aware that there was a prior trial,
but it does not follow from this that the jury will know
whether that trial was on the same charge, or whether it

resulted in a conviction or mistrial.[12]   Other distinguish-
ing factors between jury and judicial sentencing further
diminish the possibility of impropriety in jury sentencing.
As was true in *Colten,* the second sentence is not meted
out by the same judicial authority whose handling of
the prior trial was sufficiently unacceptable to have re-
quired a reversal of the conviction.   Thus, the jury,
unlike the judge who has been reversed, will have no
personal stake in the prior conviction and no motivation
to engage in self-vindication.   Similarly, the jury is un-
likely to be sensitive to the institutional interests that
might occasion higher sentences by a judge desirous of
discouraging what he regards as meritless appeals.[13]

---

[12] See n. 4, *supra,* and accompanying text.  See also n. 14, *infra.*

[13] Finally, depending upon the circumstances, it may be a de-
sirable precaution for the trial judge to give the same instructions
on the range of punishment at both trials and for the prosecutor
to seek the same sentence in each case.  See n. 3, *supra.*

It has been suggested that higher sentences on retrial might
result from vindictiveness on the part of the prosecutor.  As pun-
ishment for a successful appeal, for instance, a prosecutor might
recommend to the jury, and strenuously argue in favor of, a higher
sentence than he previously sought.  No such indication exists
on this record since the prosecutor vigorously urged the imposition
of the death penalty at the first trial.  In any event, it would be
erroneous to infer a vindictive motive merely from the severity of
the sentence recommended by the prosecutor.  Prosecutors often
request more than they can reasonably expect to get, knowing that
the jury will customarily arrive at some compromise sentence.
The prosecutor's strategy also might well vary from case to case
depending on such factors as his assessment of the jury's reaction
to the proof and to the testimony of witnesses for and against the
State.  Given these practical considerations, and constrained by
the bar against his informing the jury of the facts of prior convic-
tion and sentence, the possibility that a harsher sentence will be
obtained through prosecutorial malice seems remote.  See *Williams*
v. *McMann,* 436 F. 2d 103, 105–106 (CA2 1970).

In light of these considerations, and where improper and prejudicial information regarding the prior sentence is withheld,[14] there is no basis for holding that jury resentencing poses any real threat of vindictiveness.[15]

---

[14] The State agreed at oral argument that it would be improper to inform the jury of the prior sentence and that *Pearce* might be applied in a case in which, either because of the highly publicized nature of the prior trial or because of some other irregularity, the jury was so informed. Tr. of Oral Arg. 39. We do not decide, however, whether improperly informing the jury would always require limitation of the sentence or whether such error might be cured by careful questioning of the jury venire or by a cautionary jury instruction.

[15] Because we have concluded that jury sentencing is not susceptible of the abuse that prompted the *Pearce* decision, we need not consider what remedy would be required if jury sentencing were subjected to *Pearce*-type restrictions. It is sufficient here to note that because the institution of jury sentencing is unlike judicial sentencing in a number of fundamental ways those restrictions may not be easily invoked. Normally, there would be no way for a jury to place on the record the reasons for its collective sentencing determination, and ordinarily the resentencing jury would not be informed of any conduct of the accused unless relevant to the question of guilt. See Note, *supra*, n. 8, at 978–980; Stubbs, *supra*, n. 8, at 428–429; LaFont, Assessment of Punishment—A Judge or Jury Function?, 38 Tex. L. Rev. 835, 837–842 (1960). These important differences would not be entirely overcome by requiring that jury trials be bifurcated as suggested by the Sixth Circuit in *Pendergrass* v. *Neil*, 456 F. 2d, at 472 (pet. for cert. pending, No. 71–1472). While some jury-sentencing States have adopted bifurcated jury trials, in which the jury assesses the punishment in a separate proceeding after a verdict of guilty has been rendered (see Aplin, *supra*, n. 6, at 430, 441–442; Ga. Code Ann. § 27–2534 (1972)), bifurcation alone would not wipe away the fundamental differences between jury and judicial sentencing. It may make little sense to supply the jury with information about the defendant's conduct if the goal of jury sentencing is not necessarily to fit the punishment to the offender, and if the jury is, therefore, not concerned about matters considered pertinent to judicial sentencing.

Petitioner and recent court of appeals cases suggest that an approximation of the *Pearce* limitations could be realized either by

## C

Petitioner's final argument is that harsher sentences on retrial are impermissible because, irrespective of their causes and even conceding that vindictiveness plays no discernible role,[16] they have a "chilling effect" on the convicted defendant's exercise of his right to challenge his first conviction either by direct appeal or collateral attack. What we have said as to *Pearce* demonstrates that it provides no foundation for this claim. To the contrary, the Court there intimated no doubt about the constitutional validity of higher sentences in the absence of vindictiveness despite whatever incidental deterrent effect they might have on the right to appeal. *Colten* likewise represents a view incompatible with petitioner's contention.

Petitioner relies instead on *United States* v. *Jackson,* 390 U. S. 570 (1968), in which the Court held uncon-

---

instructing the jury that it may return no verdict higher than the former sentence, or by empowering the judge to reduce the second sentence whenever it exceeds the former sentence. See *Levine* v. *Peyton,* 444 F. 2d 525 (CA4 1971); *Pendergrass* v. *Neil, supra.* Although these alternatives would provide an absolute protection from the possibility of vindictiveness, they would also interfere with ordinary sentencing discretion in a manner more intrusive than contemplated by *Pearce.* They would achieve, in the name of due process, the substance of the result we have declined to approve under the Double Jeopardy Clause.

[16] During oral argument, Tr. of Oral Arg. 11–12, petitioner's counsel seemed to concede the absence of an improper motivation on the jury's part:

"Question. Did the jury know anything about the first trial?

"[Petitioner's Counsel]. No, they did not.

.        .        .        .        .

"Question. Was there any possibility of vindictiveness?

"[Petitioner's Counsel]. There is none, obviously not.

"Question. Why not?

"[Petitioner's Counsel]. Because the jury did not know [about] the first sentence."

stitutional the capital punishment provision of the federal antikidnaping law. By limiting to the jury the power to impose a death sentence, the statute "discouraged" the exercise by the accused of his rights to trial by jury and to plead not guilty. *Id.*, at 581. The Court found that the interest of the Government in having the jury retain the power to render the death penalty could be realized without this imposition on the rights of the accused. Therefore, the sentencing structure of the statute was struck down because it "unnecessarily" and "needlessly chill[ed] the exercise of basic constitutional rights." *Id.*, at 582.[17]

*Jackson* did not hold, as subsequent decisions have made clear, that the Constitution forbids every government-imposed choice in the criminal process that has the effect of discouraging the exercise of constitutional rights. In *Brady* v. *United States,* 397 U. S. 742 (1970), *Parker* v. *North Carolina,* 397 U. S. 790 (1970), and *North Carolina* v. *Alford,* 400 U. S. 25 (1970), defendants entered pleas of guilty in order to avoid the potential imposition of death sentences by a jury. Each was dissuaded from exercising his rights to a jury trial and to plead not guilty. Each was, in that sense, "discouraged" from asserting his rights, but the Court found no constitutional infirmity despite the claim in each case that *Jackson* compelled a contrary result. *Brady* is particularly instructive. The Court there canvassed several common plea-bargaining circumstances in which the accused is confronted with the "certainty or proba-

---

[17] In *Brady* v. *United States,* 397 U. S. 742 (1970), the Court succinctly articulated the narrow holding in *Jackson:*

"Because the *legitimate goal* of limiting the death penalty to cases in which a jury recommends it *could be achieved* without penalizing those defendants who plead not guilty and elect a jury trial, the death penalty provision 'needlessly penalize[d] the assertion of a constitutional right.'" *Id.*, at 746 (emphasis supplied).

bility" that, if he determines to exercise his right to plead innocent and to demand a jury trial, he will receive a higher sentence than would have followed a waiver of those rights. 397 U. S., at 751. Although every such circumstance has a discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices was upheld as an inevitable attribute of any legitimate system which tolerates and encourages the negotiation of pleas.[18]

Mr. Justice Harlan's opinion for the Court in *Crampton* v. *Ohio,* a companion case to *McGautha* v. *California,* 402 U. S. 183 (1971), deals at some length with the constitutional problems surrounding the imposition of difficult choices in the criminal process and is of particular relevance since it arises in the context of jury sentencing. Petitioner Crampton attacked the Ohio system of conducting capital trials. Ohio allowed the jury to determine guilt and punishment in a single trial and a single verdict, and Crampton complained that due process required a bifurcated trial because in a single trial he could not argue his case for mitigation of punishment to the jury without forgoing his right to remain silent on the issue of guilt. *Id.,* at 220–221. Thus, the free exercise of his Fifth Amendment right to remain silent was "chilled" by the prospect that a harsher jury sentence might ensue.[19] The Court did not agree, however, that the burden imposed on that right was impermissible.

---

[18] The legitimacy of the practice of "plea bargaining," as the Court noted last Term in *Santobello* v. *New York,* 404 U. S. 257 (1971), has not been doubted and where "properly administered" it is to be "encouraged" as an "essential" and "desirable" "component of the administration of justice." *Id.,* at 260–261. See also *Brady* v. *United States, supra,* at 751–753.

[19] The case was argued on the theory that the Ohio single proceeding created a "tension between constitutional rights," 402 U. S., at 211, similar to that involved in *Simmons* v. *United States,* 390 U. S. 377 (1968). The Court declined to decide the case in those

In terms pertinent to the case before us today, the Court in *Crampton* stated:

> "The criminal process, like the rest of the legal system, is replete with situations requiring 'the making of difficult judgments' as to which course to follow. . . . Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose." *Id.,* at 213.

Recognizing that the inquiry, by its very nature, must be made on a case-by-case basis, the Court indicated that the "threshold question is whether compelling the election impairs to an appreciable extent any of the policies behind the rights involved." *Ibid.* The choice imposed by the Ohio system was similar to the choice frequently faced by a criminal defendant in deciding whether to assert his right to remain silent. And the fact that the consequence of silence might be a harsher sentence was not regarded as a distinguishing factor.

These cases, we think, erase any question whether *Jackson* might call for abrogation of Georgia's unrestricted jury-resentencing process. Jury sentencing, based on each jury's assessment of the evidence it hears and appraisal of the demeanor and character of the accused, is a legitimate practice. *Supra,* at 21–22. Just as in the guilty-plea cases and *Crampton,* an incidental consequence of that practice[20] is that it

---

terms, 402 U. S., at 212–213, but focused instead on the extent to which the lack of a bifurcated proceeding created a burden on the exercise of the right to remain silent, or, stated differently, encouraged its waiver. *Id.,* at 213–217.

[20] We reiterate that we are dealing here only with the case in which jury sentencing is utilized for legitimate purposes and not as a means of punishing or penalizing the assertion of protected rights. *Jackson* and *Pearce* are clear and subsequent cases have not

may require the accused to choose whether to accept the risk of a higher sentence or to waive his rights. We see nothing in the right to appeal or the right to attack collaterally a conviction, even where constitutional errors are claimed, which elevates those rights above the rights to jury trial and to remain silent.

Petitioner was not himself "chilled" in the exercise of his right to appeal by the possibility of a higher sentence on retrial and we doubt that the "chill factor" will often be a deterrent of any significance. Unlike the guilty-plea situation and, to a lesser extent, the nonbifurcated capital trial, the likelihood of actually receiving a harsher sentence is quite remote at the time a convicted defendant begins to weigh the question whether he will appeal. Several contingencies must coalesce. First, his appeal must succeed. Second, it must result in an order remanding the case for retrial rather than dismissing outright. Third, the prosecutor must again make the decision to prosecute and the accused must again select trial by jury rather than securing a bench trial or negotiating a plea.[21] Finally, the jury must again convict

dulled their force: if the only objective of a state practice is to discourage the assertion of constitutional rights it is " 'patently unconstitutional.' " *Shapiro* v. *Thompson,* 394 U. S. 618, 631 (1969).

[21] A footnote in the Court of Appeals opinion indicates that petitioner argued in that court that unrestricted jury resentencing would have an impermissible "chilling effect" on his right to select a jury trial upon retrial. 455 F. 2d, at 641 n. 7. Although this argument is not mentioned in his appellate brief in this Court, petitioner's counsel touched on it briefly at oral argument. Tr. of Oral Arg. 13–14. What we have said here regarding the collective force of *Pearce, Colten,* the guilty-plea cases, and *Crampton* should make clear that this claim is without merit. *Jackson* is not to the contrary. Unlike that case, the choice here is subject to considerable speculation. Applying *Pearce,* the judge may or may not give a sentence as high as the jury might give. More importantly, the discouraging effect cannot be said to be "need-

34

and then ultimately the jury or the judge must arrive at a harsher sentence in circumstances devoid of a genuine likelihood of vindictiveness. While it may not be wholly unrealistic for a convicted defendant to anticipate the occurrence of each of these events,[22] especially in the

less." 390 U. S., at 583. The parameters of judge- and jury-sentencing power, given the binding nature of *Pearce,* can only be made coterminous by either (1) restricting the jury's power of independent assessment, or (2) requiring jury sentencing in every felony case irrespective whether guilt is determined by a bench trial or a guilty plea after reversal of the conviction. Either alternative would interfere with concededly legitimate state interests, and thus the burden imposed on the right to trial by jury is no less "necessary," *post,* at 44–46, than the burdens tolerated in *Brady* and *Crampton.* Where the burden of the choice is as speculative as this one is, such incursions upon valid state interests are not justified.

[22] In practical terms, as those closest to the criminal appellate process well know (see Hermann, Frivolous Criminal Appeals, 47 N. Y. U. L. Rev. 701 (1972); Carrington, Crowded Dockets and the Courts of Appeals: The Threat to the Function of Review and the National Law, 82 Harv. L. Rev. 542 (1969)), the likelihood that a convicted defendant will forgo his right to appeal or to attack collaterally his conviction has been diminishing in recent years, in part as a consequence of decisions removing roadblocks and disincentives to appeal. See, *e. g., Griffin* v. *Illinois,* 351 U. S. 12 (1956); *Douglas* v. *California,* 372 U. S. 353 (1963); *Anders* v. *California,* 386 U. S. 738 (1967); *Johnson* v. *Avery,* 393 U. S. 483 (1969); *Younger* v. *Gilmore,* 404 U. S. 15 (1971). Available statistical evidence, from both the federal and state criminal systems, demonstrates that the volume and rate of appeal have risen steadily over the last few years. In a criminal system in which appeal is the rule rather than the exception, the possibility of a higher sentence is a remote consideration. See American Bar Association Project on Standards for Criminal Justice, Criminal Appeals 19–21 (Approved Draft 1970) ("The trend today is clearly toward a much higher rate of appeal"); Administrative Office of the U. S. Courts, 1972 Annual Report of the Director II–11 (direct criminal appeals in 1972 up nearly 25% from 1971); Carrington, *supra,* at 545 (approximately a 200% increase in federal direct criminal appeals from 1959–1960 to 1966–1967).

infrequent case in which his claim for reversal is strong and his first sentence was unusually low, we cannot agree with petitioner that such speculative prospects interfere with the right to make a free choice whether to appeal.

## III

Guided by the precedents of this Court, these are the conclusions we reach. The rendition of a higher sentence by a jury upon retrial does not violate the Double Jeopardy Clause. Nor does such a sentence offend the Due Process Clause so long as the jury is not informed of the prior sentence and the second sentence is not otherwise shown to be a product of vindictiveness. The choice occasioned by the possibility of a harsher sentence, even in the case in which the choice may in fact be "difficult," does not place an impermissible burden on the right of a criminal defendant to appeal or attack collaterally his conviction.

*Affirmed.*

Mr. JUSTICE DOUGLAS dissents for the reasons stated in his dissenting opinion in *Moon* v. *Maryland,* 398 U. S. 319, 321 (1970). He also agrees with MR. JUSTICE STEWART and MR. JUSTICE MARSHALL that establishing one rule for resentencing by judges and another for resentencing by juries burdens the defendant's right to choose to be tried by a jury after a successful appeal. *United States* v. *Jackson,* 390 U. S. 570 (1968).

MR. JUSTICE STEWART, with whom MR. JUSTICE BRENNAN joins, dissenting.

In *North Carolina* v. *Pearce,* 395 U. S. 711, 725, the Court held that "vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial." As I see it, there is a real danger of such vin-

dictiveness even when a jury rather than a judge imposes the sentence after retrial. Because the Court today declines to require any procedures to eliminate that danger, even though procedures quite similar to those adopted in *Pearce* could readily be applied without sacrificing the values of jury sentencing, I must dissent.

The true threat of vindictiveness at a retrial where the jury metes out the sentence comes from the trial judge and prosecutor. Either or both might have personal and institutional reasons for desiring to punish a defendant who has successfully challenged his conviction. Out of vindictiveness the prosecutor might well ask for a sentence more severe than that meted out after the first trial, and a judge by the manner in which he charges the jury might influence the jury to impose a higher sentence at the second trial. In the present case, for example, while the petitioner was sentenced to 15 years' imprisonment after his first trial, on retrial the prosecutor asked the jury to impose the death penalty, and the judge instructed the jurors that they could inflict that punishment. It is said that the prosecutor and judge gave the jury the option to impose capital punishment at the retrial simply as a tactical move to assure that the petitioner would again receive at least a 15-year sentence. But it is not inconceivable in this setting that a prosecutor or a judge might seek to secure a higher sentence for a defendant in order to punish him for his successful appeal.*

---

*The Court finds the possibility of prosecutorial malice "remote." *Ante,* at 27. The only basis for that conclusion appears to be that the prosecutor may have quite innocent strategic reasons for requesting an increased sentence after a retrial. But that does not foreclose the possibility that a prosecutor might have quite vindictive reasons for seeking a more severe penalty, and it underlines the extraordinary difficulty a defendant would have in attempting to prove a retaliatory motivation.

It was to purge that possibility of retaliation that *Pearce* required prophylactic measures for judicial sentencing. Without such procedures, as the Court pointed out in *Pearce,* it would be extremely difficult for a defendant to establish that his higher sentence was the result of a retaliatory motivation.

I agree with the Court today that some measures are ill-suited to eliminating the possibility of retaliation in a case where the jury imposes the sentence. For example, the jury ought not to be told that its sentencing power is limited by the term imposed at the first trial, for the jury might then impose a less severe sentence in reaching a compromise verdict. But there is no reason why the trial judge should not be compelled to reduce any sentence imposed by the jury after retrial to that imposed after the first trial, unless he can affirmatively set forth the kind of reasons required in *Pearce* for the increased sentence. "Those reasons must be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding." 395 U. S., at 726.

As in *Pearce,* that procedure would serve to minimize the possibility that vindictiveness had played a role in the sentence a defendant received after a new trial, and it would free a convicted man from the fear that a successful challenge to his conviction might lead to a vindictively imposed harsher sentence after a second trial. Since this measure would, at the most, reinstate the sentence imposed by the original jury, none of the basic purposes served by jury sentencing would be jeopardized.

I also agree with my Brother MARSHALL that allowing a more severe sentence to be imposed by a jury on retrial, when that sentence would be impermissible for a judge to impose, is an infringement upon a defendant's constitutional right to a jury trial. See *United States* v. *Jackson,* 390 U. S. 570. Requiring that a judge reduce a jury-

imposed sentence to that imposed after the first trial, unless he can make the kind of findings required by *Pearce,* would eliminate that illegitimate burden upon a constitutional right.

MR. JUSTICE MARSHALL, dissenting.

I cannot agree with the Court that it is permissible for a jury, but not for a judge, to give a defendant on his retrial a sentence more severe than the one he received in his first trial, without specifying particular aspects of his behavior since the time of his first trial that justify the enhanced sentence. Such a rule is defective in two ways. First, the Court acknowledges that a jury violates the Constitution when it gives such a defendant a more severe sentence to punish him for successfully taking an appeal. *Ante,* at 26–28. Yet, when the costs, in terms of other values served by juries, of the methods of preventing, detecting, and remedying that kind of violation are balanced against the minor degree to which restrictions on jury resentencing impair the values served by jury sentencing, the need to vindicate the constitutional right warrants restrictions on juries similar to those we placed on judges in *North Carolina* v. *Pearce,* 395 U. S. 711 (1969). Second, as in *United States* v. *Jackson,* 390 U. S. 570 (1968), the possibility that a jury might increase a sentence for reasons that would be unavailable to a judge unnecessarily burdens the defendant's right to choose a jury trial. I therefore respectfully dissent.

I begin with what appears to be common ground. If the jury on retrial has been informed of the defendant's prior conviction and sentence, the possibility is real that it will enhance his punishment simply because he successfully appealed. The Court apparently agrees, *ante,* at 27 n. 13, 28–29, nn. 14–15, and suggests that a variety of preventive and remedial measures must be taken to min-

imize that possibility. Those measures, I believe, are too intrusive on the process of selecting the jury and insulating its deliberations from inquiry. In *Pearce* we devised a remedy for judicial vindictiveness in sentencing that was broader than the constitutional vice, because a remedy more closely tailored to the vice would too severely intrude on the process by which the judge made his sentencing decisions. A similar remedy is justified for the same reasons in the case of jury resentencing.

Of course a jury that does not know of a prior conviction and sentence cannot take them into account when it resentences the offender. But there is a real possibility that a jury will know of a prior sentence and will enhance the punishment it imposes out of vindictiveness as the Court apparently concedes in limiting its holding to "properly controlled retrial[s]." *Ante,* at 26. And only when the possibility of vindictiveness can confidently be said to be *de minimis* can *Pearce* be distinguished. Even in *Pearce* we acknowledged the difficulty in establishing that sentences were frequently enhanced out of vindictiveness. 395 U. S., at 725 n. 20. Indeed, we could cite only studies that showed that increased sentences on reconviction were "far from rare," *ibid.;* we had before us no evidence at all that vindictiveness actually played a part in a substantial number of cases where sentences were increased.[1]

---

[1] I assume that the Court would treat jury sentencing as it treated judge sentencing in *Pearce* if it were presented with the same kind of evidence we drew on in *Pearce*. Cf. *Witherspoon* v. *Illinois,* 391 U. S. 510, 516–518 (1968). Because of the differing institutional positions of judges, who will be repeatedly reviewed by appellate courts, and juries, which are not continuing bodies, cf. *Illinois* v. *Somerville,* 410 U. S. 458, 477 (1973) (MARSHALL, J., dissenting), evidence supporting the inference that vindictiveness may not infrequently influence jury decisions would be especially valuable from cases in which the evidence on retrial was not substantially different from the evidence at the first trial.

Given the possibility of vindictiveness, a defendant is entitled to a remedy designed to eliminate, or at least minimize, that possibility. It follows, I believe, that the defense is entitled to have prospective jurors asked carefully framed questions designed to explore their knowledge of a prior conviction and sentence. Cf. *Ham* v. *South Carolina*, 409 U. S. 524 (1973). But it will inevitably be difficult to frame questions that will do so without informing the jurors of those facts in the very act of questioning them. In addition, the right to have questions asked of prospective jurors would be meaningless unless the defense could challenge jurors for cause solely on the basis of the answers to those questions. Yet nearly all of the States in which jury sentencing is required have large rural areas,[2] where it is quite likely that a retrial after a successful appeal will be a notorious public event. It seems to me probable, then, that the right recognized by the Court will substantially impede expeditious selection of juries, for it will generally be easy to make a threshold showing of local publicity, and may often so severely limit the number of available jurors as to raise serious questions of the representativeness of the jury finally chosen.[3]

The Court suggests that a curative instruction might minimize the possibility that the jury will be improperly influenced by its knowledge of a prior conviction or

[2] In addition to Georgia, these States include Arkansas, Kentucky, Missouri, Oklahoma, Tennessee, and Virginia.

[3] Even on the Court's analysis, if a defendant must proceed to trial before a jury that knows of his prior conviction and sentence, due process would require limitations on the sentence imposed, though such limitations would not be required in "properly controlled retrial[s]." Thus, the Court does not today endorse the proposition that limitations on jury sentencing on a retrial are *never* required. See *ante*, at 28 n. 14. At most, it holds only that, in the absence of knowledge of the prior conviction and sentence, no limitations are constitutionally compelled.

sentence. *Ante,* at 28 n. 14. We have already recognized, however, that it is quite unrealistic to believe that instructions to disregard evidence that a jury might treat in a manner highly prejudicial to a defendant will often be followed. *Jackson* v. *Denno,* 378 U. S. 368, 388–389 (1964); *Bruton* v. *United States,* 391 U. S. 123, 128–137 (1968). Cf. E. Morgan, Some Problems of Proof Under the Anglo-American System of Litigation 105 (1956). And curative instructions may serve only to highlight the problem. Not every such instruction is ineffective, of course, but I would not burden the judicial process with difficult inquiries into the effectiveness of such an instruction where, as here, the State's interest in having sentences imposed by a jury can easily be satisfied without requiring such inquiries. See *infra,* at 43.

Finally, a post-sentencing inquiry of a jury that imposes a more severe sentence might disclose that vindictiveness played no part in its sentencing decision. But this could be achieved only by sacrificing the traditional secrecy of jury deliberations. Cf. *Clark* v. *United States,* 289 U. S. 1 (1933), and cases cited therein.

Because of the differing institutional positions of judge and jury,[4] and because the jury that sentences also con-

---

[4] The Court distinguishes *Pearce* from this case in part on the ground that there "the second sentence [was] meted out by the same judicial authority whose handling of the prior trial was sufficiently unacceptable to have required a reversal of the conviction," while here "the jury, unlike the judge who has been reversed, will have no personal stake in the prior conviction and no motivation to engage in self-vindication." *Ante,* at 27. The Court cannot mean that Pearce himself was resentenced by the same judge who sentenced him in the first place, for Pearce was tried before two different judges. See *State* v. *Pearce,* 266 N. C. 234, 236, 145 S. E. 2d 918, 920 (1966) (Judge Williams at first trial); *State* v. *Pearce,* 268 N. C. 707, 708, 151 S. E. 2d 571, 572 (1966) (Judge McLaughlin at second trial). Thus, the only differences in this respect are institutional, not personal: juries are not continuing bodies and may have little interest in deterring appeals or vindicating a colleague.

victs and so focuses on the facts of the offense, the question of applying the limitations imposed by *Pearce* on resentencing by judges to resentencing by juries would surely be a close one, if only the issue of possible vindictiveness were involved. Since no state interests in jury sentencing would be impaired to any significant degree by imposing such limitations, however, the question should be resolved in favor of limiting the jury's power.

One group of policies underlying jury sentencing derives from the belief that juries will be more humane and compassionate than judges: judges, it is said, represent a centralized government remote from the details of local life; judges who often must seek re-election may be unduly swayed by political considerations that have little impact on jurors; and judges who routinely deal with criminal cases may become callous and insensitive to the human problems of defendants. In contrast, the jury has close ties to the local community, and because it sits only once and then dissolves, its members ordinarily have little experience with criminal offenders. Cf. Note, Jury Sentencing in Virginia, 53 Va. L. Rev. 968, 988–991 (1967). It is somewhat anomalous, however, to contend that because juries are more compassionate than judges, they may impose a sentence more severe than a judge may constitutionally impose. I cannot understand, therefore, how the belief that juries are more compassionate than judges justifies a rule that permits a jury on retrial to impose a sentence more severe than that imposed by the original jury.

The second policy implicated in jury sentencing is that the jury serves as a "link between contemporary community values and the penal system," *Witherspoon* v. *Illinois*, 391 U. S. 510, 519 n. 15 (1968). More accurately than a judge, the jury reflects the community's moral attitude toward the particular offender. The jury's function in sentencing, then, is to make the punishment

fit the crime, not the criminal. Limitations on the sentences a jury might impose do impair its ability to decide what punishment fits the crime before it. But in cases like this one, one jury has already determined what it, as a representative of community views, thinks is an appropriate sentence. Indeed, it has done so after a trial in which reversible error, presumably prejudicial to the defendant, occurred. Thus, this state interest is not substantially impaired by limitations designed to preclude the second jury from imposing a sentence based, in part, on a desire to punish the defendant for taking an appeal.

In short, even if only the question of vindictiveness were involved in the case of jury resentencing, I would hold that limitations similar to those in *Pearce* must be imposed on jury resentencing: alternative methods of minimizing vindictiveness may seriously impair other values, and the limitations of *Pearce* do not greatly affect the values served by jury sentencing.[5] But vindictiveness alone is not the only issue here. For, by establish-

---

[5] The Court suggests that the limitations of *Pearce* cannot easily be adapted to jury sentencing. *Ante,* at 28–29, n. 15. But procedures like bifurcation, special verdicts stating the reasons for the sentence imposed or stating that the prior conviction and sentence were not taken into account, instructing the jury that the maximum sentence available to it is that imposed earlier, or empowering the judge to reduce the sentence if it exceeds the prior sentence, are some obvious alternatives. The Court suggests that the first two are inconsistent with the basic purpose of jury sentencing—making the punishment fit the crime—and that the latter two "would achieve, in the name of due process, the substance of the result we have declined to approve under the Double Jeopardy Clause." *Ante,* at 29 n. 15. The latter point confuses limitations imposed by the Constitution with choices a State might make to carry out the policies it seeks to vindicate through jury sentencing; if a State chooses to impose a maximum limit on resentencing instead of establishing a bifurcated procedure, for example, the result is not, even in substance, the result urged under the Double Jeopardy Clause, for it results from

ing one rule for sentencing by judges and another for sentencing by juries, the Court places an unnecessary burden on the defendant's right to choose to be tried by a jury after a successful appeal.

We held unconstitutional in *United States* v. *Jackson,* 390 U. S. 570 (1968), a sentencing structure that placed an unnecessary burden on a defendant's right to a jury trial. The Court today purports to distinguish *Jackson* on the ground that subsequent cases show that *Jackson* does not make unconstitutional sentencing structures that impose a burden on the exercise of constitutional rights as "an incidental consequence." *Ante,* at 32. Yet in *Jackson* we said, "The question is not whether the chilling effect is 'incidental' rather than intentional; the question is whether that effect is unnecessary and therefore excessive." 390 U. S., at 582. *Brady* v. *United States,* 397 U. S. 742 (1970), and *Crampton* v. *Ohio,* 402 U. S. 183 (1971), the cases that the Court now relies on, did not overrule *Jackson;* nor did they change the constitutional test. The question is still whether the burden on the exercise of the right to be tried by a jury is necessary, not whether it is only incidental to the accomplishment of some legitimate state purpose.

In *Brady,* a defendant sought to vacate his guilty plea on the ground that he had pleaded guilty only to avoid capital punishment, under a statute that provided for the death penalty only on the recommendation of the jury. The Court viewed his argument as applicable to

---

choice among alternatives and not from constitutional commands. Similarly, bifurcation may inject into jury sentencing considerations that the State thinks are irrelevant to its purposes in establishing a system in which juries are the sentencing authority, and it may decide to adopt some other method of complying with the constitutional requirements. But surely there is no clear conflict between bifurcation or special verdicts and the purposes of jury sentencing.

every kind of inducement that the prosecution offers to a defendant in order to elicit a plea of guilty. See 397 U. S., at 750–753. Thus, on the Court's analysis, upholding his challenge would have necessarily invalidated the widespread practice of plea bargaining, which the Court thought essential to our system of criminal justice. The burden on the exercise of a defendant's right not to incriminate himself was therefore necessary, in the terms of the analysis required by *Jackson.*

Similarly, the defendant in *Crampton* contended that failure to separate the trial of a capital case into a guilt-determining phase and a sentencing phase deterred him from testifying to facts bearing on sentence alone, for to testify would have opened him up to impeachment and to questions bearing on guilt. To the Court, however, such pressure was indistinguishable from that placed on him by a very powerful case for the prosecution that might require rebuttal, or by a large number of other widely accepted procedural rules. See 402 U. S., at 213–216. As in *Brady,* then, the Court could not agree with the defendant without holding unconstitutional many procedures that it thought essential to the criminal process.

Both *Brady* and *Crampton* applied the test of necessity. The Court today does not, as it concedes when it says that "[where] the burden . . . is as speculative as this one is," constitutional limitations on resentencing are not justified. *Ante,* at 34 n. 21. But *Jackson, Brady,* and *Crampton* did not involve assessments of the relative severity of the burden on the right to choose to be tried by a jury; [6] they turned on the question of strict

---

[6] Georgia permits a defendant to plead not guilty and waive his right to jury trial. See *Berry* v. *State,* 61 Ga. App. 315, 6 S. E. 2d 148 (1939). Of the States with jury sentencing, apparently only Kentucky does not permit such a waiver. See *Meyer* v. *Commonwealth,* 472 S. W. 2d 479, 482 (Ky. 1971). Where the prosecution

necessity.[7]   No legitimate state interest is materially advanced by permitting a second jury to enhance punishment without limitations like those placed by *Pearce* on judges, and such limitations would not substantially affect any such interest.   Thus, the rule endorsed by the Court today is not only unnecessary, but it unquestionably burdens a defendant's choice of jury trial after a successful appeal.[8]

I believe that *Pearce* and *Jackson* require that States with jury sentencing adopt procedures by which juries resentencing an offender are precluded from considering the fact that the offender successfully appealed in determining the new sentence, and so I dissent.

---

must agree to such a waiver, cf. Fed. Rule Crim. Proc. 23 (a), it would of course be impermissible to refuse agreement solely because a judge would be restricted in resentencing while a jury would not, cf. *Singer* v. *United States*, 380 U. S. 24, 37 (1965).

[7] In discussing whether the holding today burdens the right to appeal, the Court says that for the undesired outcome to occur, "[s]everal contingencies must coalesce." Thus, "the likelihood of actually receiving a harsher sentence is quite remote at the time a convicted defendant begins to weigh the question whether he will appeal." *Ante,* at 33.  But, of the list the Court provides, only two remain contingent when the defendant must decide to waive or insist upon a jury trial—reconviction and sentence.  The Court acknowledges that in some cases, even when all the contingencies must be taken into account, the possibility of a harsher sentence might well affect the decision to appeal. *Ante,* at 34–35.  The burden will surely be substantial when the contingencies are reduced to two.

[8] The Court, in its footnote discussing this argument, does assert that the burden "cannot be said to be 'needless.' " *Ante,* at 33–34, n. 21. The sentence following that assertion does not supply any reason why the burden is necessary; it simply states two ways in which the burden might be eliminated without saying why those alternatives are so impractical as to make necessary the burden that after today's decision, may be placed on the right to jury trial.