589 P.2d 101

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Phillip Lewis LINDQUIST, Defendant-Appellant.**

**No. 12218.**

Supreme Court of Idaho.

Jan. 11, 1979.

Allen V. Bowles, Moscow, for defendant-appellant.

Wayne L. Kidwell, Atty. Gen., Lynn E. Thomas, Deputy Atty. Gen., Boise, for plaintiff-respondent.

BAKES, Justice.

In January of 1976 a jury convicted defendant appellant Phillip Lewis Lindquist

of the first degree murder of Joy Weitz in January of 1975. In February of 1976 the district court sentenced the defendant to death pursuant to the version of I.C. § 18–4004 then in effect, which provided "[e]very person guilty of murder in the first degree shall suffer death . . . ." Ch. 276, § 2, 1973 Idaho Sess.Laws 588. In this appeal the defendant challenges only his sentence, and this on constitutional grounds.

■ Subsequent to the defendant's sentencing, the United States Supreme Court decided *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), which held unconstitutional a North Carolina mandatory death penalty statute virtually identical to the Idaho statute under which this defendant was sentenced. *See Woodson v. North Carolina, supra* at 286, 96 S.Ct. 2978. The version of I.C. § 18–4004 in effect at the time the defendant was sentenced was unconstitutional under the holding of the United States Supreme Court in the *Woodson* case and the defendant's death sentence must therefore be set aside. The more difficult issue presented here is whether on resentencing the death penalty may be imposed on this defendant.

■ There is some authority for the proposition that when a statute is determined to be unconstitutional the former statute remains in effect as if it had never been amended. *See American Independent Party in Idaho, Inc. v. Cenarrusa*, 92 Idaho 356, 442 P.2d 766 (1968). However, the former statute is of no help in this case since it likewise was constitutionally defective. Prior to its amendment in 1973, I.C. § 18–4004 provided:

> "Every person guilty of murder in the first degree shall suffer death or be punished by imprisonment in the state prison for life, and the jury may decide which punishment shall be inflicted."

*See* ch. 276, § 2, 1973 Idaho Sess.Laws 588. Though this pre-1973 statute permitted the imposition of either a sentence to death or life imprisonment, it provided no guidance to control the sentencing authority in determining who would receive the death penalty and who would receive a sentence of life imprisonment. Therefore unquestionably the pre-1973 statute violated the Eighth and Fourteenth Amendments to the United States Constitution under the United States Supreme Court's decision in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

Neither is the fact that the legislature, subsequent to the defendant's crime, conviction and sentencing, has again amended I.C. § 18–4004 of any assistance here. In 1977 the legislature amended I.C. § 18–4004 by providing that "[s]ubject to the provisions of 19–2515, Idaho Code, every person guilty of murder of the first degree shall be punished by death or by imprisonment for life." Ch. 154, § 3, 1977 Idaho Sess.Laws 390. I.C. § 19–2515 was at the same time amended to require judicial inquiry into aggravating and mitigating circumstances and a finding that at least one of ten enumerated aggravating circumstances existed in order to impose a sentence of death. Ch. 154, § 4, 1977 Idaho Sess.Laws 390. I.C. § 19–2827, which requires review by the Idaho Supreme Court of any death sentence and delineates standards for that review, was also added to the Idaho Code. Ch. 154, § 5, 1977 Idaho Sess.Laws 390.

■ These statutes cannot be applied to this defendant. While the statutes were amended in 1977, the crime of which this defendant was tried and convicted in 1976 was committed in 1975. The legislature itself has declared that its acts are not to be applied retroactively unless expressly so declared. I.C. § 73–101; *Edwards v. Walker*, 95 Idaho 289, 507 P.2d 486 (1973). The 1977 act contains no such declaration, but specifically provides that it "shall be in full force and effect on and after passage and approval." It was approved March 28, 1977. Ch. 154, § 8, 1977 Idaho Sess.Laws 390.

This Court has recently had occasion to consider a similar issue in *Wolf v. State*, 99 Idaho 476, 583 P.2d 1011 (1978). With reference to an amendment of the statute setting forth the factors to be considered by

the courts in deciding whether to waive jurisdiction under the Youth Rehabilitation Act, I.C. §§ 16–1801 to –1845, Chief Justice Shepard wrote: "Since this statute was enacted after the murder of Mr. Flory, the ex post facto clauses of the Idaho and federal Constitutions prohibit us from applying it to these appeals." 583 P.2d at 1015. *See* Idaho Const., art. 1, § 16; U.S.Const., art. 1, § 9.

We are aware that under the United States Supreme Court's recent decision in *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), it is at least arguable that the provisions of the 1977 act may be applied to this defendant without violating the *ex post facto* clause of the United States Constitution. In *Dobbert* the United States Supreme Court upheld the imposition of a death sentence on a defendant who was tried and sentenced under a valid capital punishment statute even though that statute was not in effect at the time the crime was committed. In *Dobbert* the amendment to the statute came after the act, but before trial. 432 U.S. at 288–89, 97 S.Ct. 2290. However, unlike the circumstances in *Dobbert,* the defendant Lindquist was sentenced pursuant to an unconstitutional capital punishment statute. The 1977 amendments, under which the state has argued that the defendant should be resentenced, went into effect a year after the defendant brought this appeal. At least two courts have concluded that this factual distinction with *Dobbert* is decisive and therefore have refused to order defendants convicted and sentenced under prior constitutionally defective statutes resentenced under new statutes. *Meller v. State,* 581 P.2d 3 (Nev.1978); *State v. Rodgers,* 242 S.E.2d 215 (S.C.1978). However, we need not decide whether *Dobbert* is applicable to the circumstances of this case or whether the *ex post facto* clause of the Idaho Constitution requires a different interpretation. Well established principles of constitutional law dictate that we not unnecessarily reach those constitutional issues. *See Ashwander v. Tennessee Valley Au-*

*thority,* 297 U.S. 288, 345–48, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *Poesy v. Bunney,* 98 Idaho 258, 561 P.2d 400 (1977). Here, our statutes themselves clearly prohibit the retroactive application of the 1977 statute to this defendant. I.C. § 73–101.

█ The state argues that we should construe the statute under which the defendant was sentenced in such a way that it passes constitutional muster. Both the state in its briefs and argument, and the dissenting opinion of Chief Justice Shepard, point out that the Court of Criminal Appeals of the State of Texas in the case of *Jurek v. State,* 522 S.W.2d 934 (Tex.Cr.App. 1975), interpreted their statute to permit the sentencing authority to consider any mitigating circumstances which the defendant might present. In turn, the Supreme Court of the United States affirmed the imposition of the death penalty in *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), based upon the Texas court's authoritative construction of their murder statute. However, there is a substantial difference between the Idaho statute applicable to this case, and the Texas statute in *Jurek.* The Idaho statute cryptically provides that "[e]very person guilty of murder in the first degree shall suffer death," whereas the Texas statute provided that after a determination that a defendant is guilty of murder with malice, the jury, in a separate proceeding, may impose either the penalty of life or death, depending upon a consideration of three questions, one of which was whether or not "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." The Texas court in *Jurek* held that this statutory authorization allowed the sentencing authority to consider mitigating as well as aggravating circumstances in determining whether to impose on a defendant a sentence of life or death. Obviously there is a very real distinction between the Texas and Idaho[1] statutes, and it is the Idaho statute

---

1. A recent Arizona decision, *State v. Watson,* 120 Ariz. 441, 586 P.2d 1253 (1978), must like-

wise be distinguished. In *Watson* the Arizona court ruled that a provision of the Arizona

by which we are bound. To construe our Idaho statute as the Texas court has construed its statute would require that we ignore the manifest legislative intent that the death penalty be the mandatory punishment for first degree murder. To do so would require that we rewrite substantive statutory law. The California court, recently presented with much the same argument, concluded:

"The People argue finally that the defects in the California statutory scheme for imposition of capital punishment can be overcome by judicially mandated procedures, which this court should pronounce because the Legislature intended to write a constitutional death penalty. . . . We decline the People's invitation. They ask us not to interpret, but to rewrite the law in a manner which we have shown would be contrary to the manifest legislative intent in enacting [a mandatory death penalty statute]. Decisions as to which criminal defendants shall suffer the death penalty, whether these decisions shall be made by judge or jury, whether and to what extent a jury determination is reviewable by the trial court and/or the reviewing court, and the scope of responsibility to be given this court to safeguard against arbitrary imposition of the death penalty are matters of legislative concern. Were this court to attempt to devise the necessary procedures and criteria we would not only invade the legislative province, but would also be in the position of having to pass objectively on the constitutionality of procedures of our own design." *Rockwell v. Superior Court*, 18 Cal.3d 420, 134 Cal. Rptr. 650, 665, 556 P.2d 1101, 1116 (1976).

death penalty statute which restricted the mitigating circumstances the sentencing court could consider was unconstitutional under *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). The Arizona court, however, ruled that the provision was severable from the other portions of the Arizona death penalty and ordered that the defendant be resentenced and that he be allowed to present to the sentencing judge any mitigating

*Accord, French v. State*, 362 N.E.2d 834 (Ind.1977); *Kennedy v. State*, 559 P.2d 1014 (Wyo.1977). Likewise, what the state asks this Court to do is not interpret but, under the ruse of judicial construction, to rewrite the 1973 statute to read like the 1977 statute. We simply do not have the power to rewrite substantive statutory law. *See Newlan v. State*, 96 Idaho 711, 716, 535 P.2d 1348, *appeal dismissed sub nom. Agost v. Idaho*, 423 U.S. 993, 96 S.Ct. 419, 46 L.Ed.2d 367 (1975); *Anstine v. Hawkins*, 92 Idaho 561, 447 P.2d 677 (1968).

The argument that the Idaho first degree murder statute imposing the death penalty can be construed by this Court to make it constitutional is subject to another infirmity. Such a retroactive construction, if applied to the facts of this case, poses serious *ex post facto* problems under Art. 1, § 9, of the United States Constitution and Art. I, § 16, of the Idaho Constitution. *Wolf v. State*, 99 Idaho 476, 583 P.2d 1011 (1978); *Bouie v. City of Columbia*, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). *Cf. Dobbert v. Florida, supra* (sentence imposed pursuant to Florida death penalty statute enacted subsequent to the crime but prior to sentencing held not to violate the *ex post facto* clause of the United States Constitution). As the Supreme Judicial Court of Massachusetts stated in *Commonwealth v. Harrington*, 323 N.E.2d 895 (Mass.1975):

"Apart from what seem like clear instructions to us from the United States Supreme Court, a retroactive legislative change from discretionary to mandatory death sentence would be an unconstitutional ex post facto law. United States Constitution, art. 1, § 10. Declaration of Rights of the Massachusetts Constitution, art. 24. [Citations omitted]. An unfore-

circumstances. Unlike the provision of the Arizona statute which expressly contemplated sentencing discretion, the mandatory death provision of the 1973 Idaho statute is the very essence of that statute, and therefore the severability approach of the Arizona court in *Watson* is no answer to the constitutional defect in the Idaho statute.

seeable judicial decision having the same effect is equally barred by the due process clause. *Bouie v. Columbia,* 378 U.S. 347, 353–54, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964)." 323 N.E.2d at 900.

■ It has also been argued that, regardless of the language of the Idaho statutes, the trial court here concluded that he was not obligated to follow the Idaho statute mandating the death penalty and that he did in fact consider aggravating circumstances and offered defendant the opportunity to present evidence of mitigating circumstances. Therefore, it is argued we should affirm the judgment of the trial court. It is true that the trial court did state that he was approaching the sentencing in this case on two bases—one that he had no discretion and was mandated by the statute to impose a death penalty, and the other, that under the decision of this Court in *State v. McCoy,* 94 Idaho 236, 486 P.2d 247 (1971), he had inherent judicial discretion and therefore could impose a sentence other than death. However, a careful reading of the transcript shows that, while the trial court so stated that he was proceeding with sentencing "on the theory of [these] two bas[e]s," it is abundantly clear that he was of the opinion that *McCoy* had been incorrectly decided and that it had no validity and should not be followed. Accordingly, we are not persuaded that the trial court, in imposing sentence, was not influenced by his own strongly expressed opinion that the *McCoy* case did not and could not abrogate the automatic death penalty mandated by the Idaho statute.

■ Our decision does not mean, however, that the defendant should entirely escape punishment for the crime of which he stands convicted. When the defendant was found guilty of first degree murder, he was necessarily found guilty of the lesser included offense of second degree murder. *State v. Hutter,* 145 Neb. 798, 18 N.W.2d 203 (1945); *see State v. Arney,* 218 Kan. 369, 544 P.2d 334 (1975). At the times when the crime was committed and the defendant convicted and sentenced, the punishment for the included offense of

second degree murder was "not less than ten years and the imprisonment may extend to life." I.C. § 18–4004; ch. 276, § 2, 1973 Idaho Sess. Laws 588. Accordingly, the sentence of death must be vacated and the cause remanded to the district court for resentencing to any punishment permitted for the conviction of the lesser included offense of second degree murder.

Although this case presents a question of first impression for this Court, this question has frequently arisen in our sister states as a result of the United States Supreme Court's decisions concerning death penalty statutes. We believe our decision here is supported by the collective wisdom of virtually ever other court which has confronted this issue:

"This is not the first time that decisions of the United States Supreme Court have invalidated Louisiana provisions relative to capital punishment. In *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and again in *Furman v. Georgia, supra,* Louisiana statutes were effectively invalidated. Each time this Court was called upon to resolve the question of sentencing defendants validly convicted but unconstitutionally sentenced to death. In each case we instructed the trial courts to substitute life imprisonment for the death sentence." *State v. Jenkins,* 340 So.2d 157, 179 (La. 1976).

*See, e. g., Boyd v. Commonwealth,* 550 S.W.2d 507 (Ky.1977); *Smith v. State,* 349 So.2d 1244 (La.1977), *appeal dismissed,* 435 U.S. 920, 98 S.Ct. 1480, 55 L.Ed.2d 513 (1978); *State v. Rondeau,* 89 N.M. 408, 553 P.2d 688 (1976); *State v. Rumsey,* 267 S.C. 236, 226 S.E.2d 894 (1976); *Collins v. State,* 550 S.W.2d 643 (Tenn.) *cert. denied sub nom. Morgan v. Tennessee,* 434 U.S. 905, 98 S.Ct. 303, 54 L.Ed.2d 192 (1977); *Kennedy v. State,* 559 P.2d 1014 (Wyo.1977).

We are not unmindful of the apparent will of the people of this state that the death penalty be imposed on the perpetrators of murders of the most abominable and depraved kind. We have not recited the gruesome details of this crime, but it is

sufficient to note that this defendant certainly falls within that classification. Nonetheless, the irrefutable fact remains that at the time this crime was committed and the defendant was tried, convicted and sentenced there was no valid death penalty statute. This fact, which will surely be described as a loophole, is largely the consequence of the legislature's understandable and excusable failure to divine beforehand how the United States Supreme Court in *Woodson* would read its own rather confusing decision in *Furman*. Nonetheless, the principles of law to which we must necessarily adhere today are the same principles which preserve this Court as an institution of justice according to the law—not according to the whims or visceral feelings of judges—and which protect every citizen of this state and nation from the peril of arbitrary and unbridled legislative and judicial power.

The sentence is set aside and the case remanded for resentencing in accordance with this opinion.

McFADDEN and BISTLINE, JJ., concur.

SHEPARD, Chief Justice, dissenting.

The majority declines to spell out the details of the acts for which defendant-appellant was convicted of first degree murder. In light of the recent decisions of *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and *Bell v. Ohio*, 438 U.S. 637, 98 S.Ct. 2977, 57 L.Ed.2d 1010 (1978), I believe those details are necessary to the decision.

Although the defendant-appellant took the stand in his own defense and denied much of the testimony of the key witnesses in the State's case, following trial and conviction but prior to sentencing, the defendant confessed his participation in the crime. Hence, the facts are largely uncontroverted.

Phillip Lindquist, as specifically found by the trial judge and as indicated in the record, was and is a very intelligent and educated man. He graduated from high school and studied engineering in college. He calls himself a construction engineer and has supervised numerous and sizeable construction projects. As categorized by the trial judge, he is a "person who decided intellectually and intelligently to commit a murder for money."

One Phillip Weitz operated a construction business in Spokane, Washington, and was at one time an employer of Lindquist. Charles Vetch operated a finance business in Spokane and was evidently a man of some wealth. Phillip Weitz formulated a plan to steal gold allegedly owned by Weitz's father and valued at two million dollars. According to one of the conspirators, the killing of the elder Weitz and his wife would have been necessary during that proposed crime. Phillip Weitz felt that a substantial sum of money would be necessary to finance that crime. He had no ready source of sufficient money and thus decided upon the killing of his wife, Joy Weitz, in such a fashion as to appear an accident and thereby collect $60,000.00 in insurance proceeds. Joy Weitz was the mother of three children, aged six, four and three, and at the time of her death was pregnant with twins. Phillip Weitz contacted Vetch, who in turn contacted Lindquist and arranged for the murder of Joy Weitz. Lindquist was to be paid $10,000.00 for doing the actual killing and Weitz and Vetch were to split the $60,000.00 insurance proceeds.

Lindquist made five separate attempts to murder Joy Weitz, all of which failed except the last. Included among those prior plans was to be a simulated hunting accident, a car-truck accident, and an incident in which she was to be drugged, placed in a car and the car pushed into a deep lake.

The violence did not stop with the arrest of the defendant. The state's key witness, because of threats on his life, had to be hidden away with an assumed identity under the protection of U.S. Marshals. The trial judge was advised that threats had been made against certain witnesses and security precautions were taken and spectators at trial were searched. Threats were made upon the lives of the family and children of the prosecuting attorney.

The scenario for the attempt which finally succeeded was that Phillip Weitz would lure his wife Joy Weitz to a remote area on

the pretext of needing her help in the recovery of construction equipment. Lindquist would appear, strike her on the head and then run over her with a truck. Joy Weitz appeared at the location, as did Lindquist. He proceeded to beat her on the head with a two by four wooden club, but she did not lose consciousness. She begged and pleaded with him for not only her own life, but those of her unborn children. Somehow she was able to elude him, climb back into her car and lock the doors. Not being able to gain access, Lindquist shot her to death through the closed window of the car. He then left the scene and drove some miles away where he left a red rag tied to a stake at a predesignated spot on the road as a signal to Vetch and Weitz that his portion of the murder scheme had been completed. It is for this crime that the majority of this Court remands the defendant for resentencing for second degree murder.

The root cause of what I deem to be the majority's error, however lies not with members of this Court but which others. In my judgment, this Court today errs in accepting at face value, without sufficient analysis, what a seriously divided United States Supreme Court purportedly stated in *Woodson.* The majority opinion here is restrained in its terminology describing the language and the actions of the high Court in the area of capital punishment cases. It states that the language of that Court is "rather confusing." Mr. Justice Rehnquist states: "The Court has gone from pillar to post, with the result that the sort of reasonable predictability upon which legislatures, trial courts, and appellate courts must of necessity rely has been all but completely sacrificed." See *Lockett v. Ohio, supra,* (Rehnquist, J. dissenting). Mr. Justice White, in *Lockett,* has described the Court's "about face." Perhaps he had in mind Karl Llewellyn's doggerel:

There was a man in our town
   and he was wondrous wise;
he jumped into a BRAMBLE BUSH
   and scratched out both his eyes—
and when he saw that he was blind,
   with all his might and main
he jumped into another one
   and scratched them in again.

K. N. Llewellyn, Bramble Bush, 3d ed., 1969.

I believe it beyond cavil that the United States Supreme Court engages in the making of major social policy for this country. Such decisions are couched in terms of construction of portions of the United States Constitution. In times past the debate has raged over whether such "intrusion" of the court into social policy determinations was the correct place for the court in the scheme of government, but I believe the court has largely been accepted as the conscience of the nation. Such is perhaps demonstrated by the response of our people in state governments to those decisions which seek to remove the cancers of intolerance, hatred and disparate treatment of minorities from our nation's face; the reapportionment and redistricting cases seeking more representative government at the state level; and those decisions seeking to require improved law enforcement through the medium of exclusionary rule decisions. The response of those in the law to those types of decisions has ranged from near apoplexy to sheer joy dependent upon whose own personal philosophy has been vindicated or shattered. Most of us have fallen somewhere in between and have recognized that the court of last resort may not always be "correct" (whatever that means), but that it is the court of last resort, it has spoken and in the concept of the supremacy clause of the United States Constitution, we are bound in state cases to follow, as best we can, the decisions of the United States Supreme Court.

Unfortunately, such is not true in the area in which we treat today. In 1972, in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, the court struck down statutes relating to the death penalty. At best that decision is confusing. One thing I deem clear, however, was that the beliefs of some members of the court were not adopted, *i. e.,* that the taking of human life by society in retribution for crime regardless of circumstances was unconstitutional.

That philosophy was argued, commented upon, accepted by some members of the court and firmly rejected by a majority. What was thought by members of the court to be gained from those opinions such as *Furman v. Georgia, supra,* is less than clear as is demonstrated by its own members in subsequent decisions. What is important is what the people of this nation and the state governments derived from the court's opinions. It was believed, and not without reason, that the court desired certainty and equality of treatment in sentencing for capital crimes. What better way to accomplish those goals than requiring the death penalty. Thereafter no question of uncertainty could result and all assuredly would be treated the same. No matter that such a mandatory penalty had supposedly fallen from favor with the people and their legislators—where the court would lead the states would follow. It was and is clear, in my judgment, that the people desire the continuation of the death penalty. Since the court had not barred the death penalty, it could and should be continued but under such terms and procedures as prescribed by the court. Many state legislatures, including Idaho's, so acted, as urged by other responsible state officials. Since that time the states and their courts, and the United States Supreme Court, have been locked in a maelstrom of contradiction and confusion.

All of this leads to a consideration of *Woodson* held by today's majority to be controlling. There three members of the Court join in an opinion which, for some reason, is denominated the "plurality." That "plurality" opinion states clearly "we reject *this argument* [that "the imposition of the death penalty is cruel and unusual punishment"]. 428 U.S. p. 285, 96 S.Ct. 2978. Two other members of the Court disagree with that view and state that the death penalty is a cruel and unusual punishment under any circumstances. Three other members of the *Woodson* court dissented and joined with White, J. in voting for affirmance of the court below. Blackmun, J. dissented on the basis of his "excruciating agony of the spirit" expressed in *Furman.*

What madness is that this denominates such thought process by some members of that Court as the "law of the land" and enjoins on those of us in the law not only the task of attempting to understand, but the clear duty and responsibility to apply its result and "reasoning."

The majority in the case at bar today tells us that in *Woodson* the Supreme Court did not mean what it said in *Furman,* but rather that there should be flexibility and disparate treatment of offenders depending on the "circumstances of the offense and the character and propensities of the offender." We are told that the "practice of individualizing sentencing determinations" is not only "enlightened policy" but becomes a "constitutional imperative" in capital cases.

Ignoring that lateral arabesque which takes courts away from certainty and sameness of treatment of offenders where do we nonetheless arrive. If we assume that the "plurality" of *Woodson* has any validity, what does it purport to tell. The dissents inform us it tells nothing. I disagree in part. We are informed "death is a punishment different from all other sanctions" and for this advice we should be truly grateful. Aside from that, I find significant only a discussion of the North Carolina statute.

The *Woodson* court suggests that the North Carolina statute failed "to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant," "the circumstances of the particular offense," and the "possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind." The statute it was said "treats all persons convicted of a designated offense not as unique individual human beings, but as members of a faceless undifferentiated mass to be subjected to the blind infliction of the penalty of death." Of more recent vintage are *Bell v. Ohio, supra,* and *Lockett v. Ohio, supra,* which seem to indicate that the statute under consideration there would bar any consideration of

whether the defendant either intended to kill or participated in the actual killing. I deem the majority opinion today to err in its examination only of our statute and inexplicably omit any consideration of the actual sentencing procedures utilized by the trial judge. I believe such consideration is not only desirable but necessary in view of *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), and *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). As noted in *Lockett,* the statute approved in *Proffitt* contained a list of mitigating factors but six members of the Court assumed that in approving the statute that the range of mitigating factors was not exclusive. There also it was noted that *Jurek* involved a Texas statute which made no explicit reference to mitigating factors, but the Texas court had so interpreted the statute to permit a sentencer to consider whatever mitigating circumstances there might be despite the facial narrowness of the Texas statute.

I deem the record here to be clear that the trial judge with perhaps more prescience than could be expected anticipated rulings of the United States Supreme Court following *Furman v. Georgia, supra.* The trial judge here initially adopted a dual approach in questioning his authority to impose a death sentence. The record contains substantial dialogue between court and counsel regarding his sentencing options, particularly in view of the questioned continued vitality of *State v. McCoy,* 94 Idaho 236, 486 P.2d 247 (1971). It is clear to me that at the time of pronouncing sentence the trial judge assumed and believed that he need not impose the death sentence as supposedly mandated by the statute, but could commute, withhold or grant any sentence less than death.

Following trial the defendant was ordered to submit to extensive psychological testing and psychiatric evaluation, the results of which were before the sentencing judge. A presentence report was ordered, prepared, submitted and considered by the trial judge. An opportunity was furnished the defense to provide any matters in mitigation. The sentencing judge specifically found that the defendant was not suffering any neurosis or psychosis and had no existent personality disorder. He considered "the very cold deliberate and vicious manner" in which the defendant undertook to kill this woman, undertook it not only once, but several times repeatedly before she was killed." He was "made aware that she was pregnant and expecting" and "aware that she was already the mother of children . . . ."

The sentencing judge stated, "I have studied all of the psychiatric and psychological reports, the presentence report time and time again. I reviewed time and again my notes of your trial. I don't know what more could possibly be presented to learn in this case."

To equate the procedure here and the consideration of this defendant and the circumstances of this crime with what was criticized in *Woodson* as the blind infliction of the death penalty on a faceless undifferentiated mass is impossible for me to accept.

With all deference and respect to our brethren on the Bench of the United States Supreme Court, I regret that I can neither understand what they have said as a court, where they now stand as a court or where they may be going in this important area of the law involving capital cases and the death penalty. I may well be wrong in my interpretation of what they have said and what they will do. I believe it is equally possible that today's majority may be in error in their understanding. I am sure the sentencing judge here suffered an agony of the spirit much greater than that of Mr. Justice Blackmun. This Judge had need to face the human rather than decide in the sanctity and solitude of his chambers while considering an abstract principle. The trial judge shouldered his heavy burden and I think this Court should affirm his decision, leaving to the United States Supreme Court, if they so desire, the option of deciding the fate of Phillip Lewis Lindquist.

DONALDSON, J., concurs.

DONALDSON, Justice, dissenting.

I agree with the majority that I.C. § 18–4004 in effect at the time appellant was sentenced was unconstitutional and that appellant's death sentence must, therefore, be set aside. However, I am persuaded that on resentencing the death penalty may be imposed on this appellant without working an illegal retroactive application of our present death penalty statute.

A review of recent United States Supreme Court cases will show that I.C. § 18–4004, when read together with and interpreted by I.C. § 19–2515, is constitutional and in conformance with Supreme Court requirements for capital sentencing. *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Gregg v. Georgia, supra.*

Imposing the death penalty for the crime of first degree murder is neither inherently barbaric nor an unacceptable mode of punishment; neither is it always disproportionate to the crime. *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977); *Jurek v. Texas, supra; Proffitt v. Florida, supra; Gregg v. Georgia, supra.* Recent United States Supreme Court cases have outlined procedural limits which are designed to ensure that the death penalty is not arbitrarily and capriciously imposed. It was the lack of adequate procedural safeguards which prompted the Supreme Court to hold unconstitutional the death penalty in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); and *Roberts v. Louisiana,* 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977). As the Court stated in *Woodson,* "the issue, like that explored in *Furman,* involves the procedure employed by the State to select persons for the unique and irreversible penalty of death." 428 U.S. at 287, 96 S.Ct. at 2983.

The sentencing procedures mandated by the United States Supreme Court in the recent death penalty cases are as follows:

(1) there must be a hearing to consider the aggravating and mitigating circumstances surrounding the defendant's crime; (2) there must be standards to guide the sentencing authority in its election of which first degree murderer shall live and which shall die; and (3) there must be meaningful appellate review to guard against the arbitrary and capricious exercise of the sentencing power. The present I.C. § 18–4004, read together with I.C. § 19–2515 appears to meet all the above requirements.

The question is therefore raised as to whether remanding Lindquist for sentencing under the amended statute works a retroactive application of that statute. Idaho Code § 73–101 states, "No part of these compiled laws is retroactive, unless expressly so declared." Remanding for sentencing does not work an illegal retroactive application of the statute.

To consider this argument, several facts must be remembered. Lindquist was found guilty of first degree murder. This statute is constitutional and we have upheld his conviction. I.C. § 18–4001. The majority has ruled his sentencing invalid for infirmities previously mentioned. The sentencing statute is completely separate from the murder statute. Because the previous sentencing statute was unconstitutional, the case should be remanded for sentencing under the new statute. The crime Lindquist was found guilty of has not changed because of our ruling. The change in sentencing affords Lindquist greater protections than did the previous sentencing statute.

A clear understanding of what is meant by retroactive will show that I.C. § 73–101 presents no bar to resentencing under amended I.C. § 19–2515 in this case.

A statute is not made retroactive merely because it draws upon facts existing prior to its·enactment. Thus changes in procedural law have been held applicable to existing causes of action. The effect of such statutes is actually prospective in nature since they relate to the procedure to be followed in the future.

*Olivas v. Weiner,* 127 Cal.App.2d 597, 274 P.2d 476, 479 (1954).

Lindquist has been convicted of murder, the same murder statute in effect at the time of the murder and at his trial. Lindquist has a right to be sentenced according to constitutional standards. *Woodson v. North Carolina, supra.* Lindquist does not have a vested right to be wrongly sentenced.

This Court has rejected the "doctrine that a prisoner, whose guilt is established by a regular verdict, is to escape punishment altogether because the court committed an error in passing the sentence." [citations omitted] The Constitution does not require that sentencing should be a game in which a wrong move by the judge means immunity for the prisoner. [citations omitted] In this case the court "only set aside what it had no authority to do, and substituted directions required by the law to be done upon the conviction of the offender."

*Bozza v. United States,* 330 U.S. 160, 166–7, 67 S.Ct. 645, 649, 91 L.Ed. 818 (1947). *See also Chaffin v. Stynchcombe,* 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973); *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969).

In rejecting a contention that reviewing a lower court judgment (under jurisdiction granted by a statute passed after that judgment) works a retroactive effect, the United States Supreme Court said: " 'The truth is,' says Chief Justice Parker in *Foster v. Essex Bank,* 16 Mass. 245, 'there is no such thing as a vested right to do wrong.' " *Freeborn v. Smith,* 2 Wall. 160, 17 L.Ed. 922 (1865).

Because Lindquist has no vested right in being sentenced under the unconstitutional statute, it does not work a retroactive effect to sentence him under the constitutional statute. "[A] retroactive effect is obtained only when a statute is applied to rights acquired prior to its enactment." *Dumesnil*

*v. Reeves,* 283 Ky. 563, 142 S.W.2d 132 (1940).

"A statute which takes away or impairs vested rights, acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions already past, is deemed retroactive." *Butte & Superior Mining Co. v. McIntyre,* 71 Mont. 254, 229 P. 730, 733 (1924).

This Court has followed those pronouncements on the definition of retroactivity. *Engen v. James,* 92 Idaho 690, 448 P.2d 977 (1969).

A law is not retroactive merely because part of the factual situation to which it is applied occurred prior to its enactment; rather, a law is retroactive only when it operates upon transactions which have been completed or upon rights which have been acquired or upon obligations which have existed prior to its passage. *Frisbie v. Sunshine Mining Co.,* 93 Idaho 169, 172, 457 P.2d 408, 411 (1969).

Lindquist argues that exposing him to the death penalty on resentencing works an ex post facto violation.[1] In *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), the United States Supreme Court answered that question in the negative.

It is equally well settled, however, that "the inhibition upon the passage of *ex post facto* laws does not give a criminal a right to be tried, in all respects, by the law in force when the crime charged was committed." *Gibson v. Mississippi,* 162 U.S. 565, 590, 16 S.Ct. 904, 40 L.Ed. 1075 (1896). "[T]he constitutional provision was intended to secure substantial personal rights against arbitrary and oppressive legislation, see *Malloy v. South Carolina,* 237 U.S. 180, 183, 35 S.Ct. 507, 59 L.Ed. 905, and not to limit the legislative control of remedies and modes of procedure which do not affect matters of substance." [citation omitted].

---

1. An ex post facto law is a statute which "punishes as a crime an act previously committed, which was innocent when done; which makes

more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available

*Id.* at 293, 97 S.Ct. at 2298.

Petitioner's second *ex post facto* claim is based on the contention that at the time he murdered his children there was no death penalty "in effect" in Florida. This is so, he contends, because the earlier statute enacted by the legislature was, after the time he acted, found by the Supreme Court of Florida to be invalid under our decision in *Furman v. Georgia, supra.* Therefore, argues petitioner, there was no "valid" death penalty in effect in Florida as of the date of his actions. But this sophistic argument mocks the substance of the *ex post facto* clause. Whether or not the old statute would in the future, withstand constitutional attack, it clearly indicated Florida's view of the severity of murder and of the degree of punishment which the legislature wished to impose upon murderers. The statute was intended to provide maximum deterrence, and its existence on the statute books provided fair warning as to the degree of culpability which the State ascribed to the act of murder.

*Id.* at 297, 97 S.Ct. at 2300.

The death penalty statute in effect at the time Dobbert murdered two of his children was later declared unconstitutional by the Florida Supreme Court. By the time Dobbert was sentenced, however, a constitutional death penalty statute had been enacted. The United States Supreme Court held that sentencing him to death under the new statute did not violate the ex post facto clause. In so holding, the Supreme Court stressed several factors. First, the changes made by the new statute were clearly procedural. The statute altered the methods employed in determining whether the death penalty was to be imposed; there was no change in the quantum of punishment attached to the crime. Second, the procedural changes were ameliorative. The new statute afforded significantly more safeguards to ensure that the death penalty was

according to law at the time when the act was committed." *Beazell v. Ohio,* 269 U.S. 167, 169, 46 S.Ct. 68, 70 L.Ed. 216 (1925). Although the ex post facto clause is a limitation on the power of the state legislatures, the due process

not arbitrarily and capriciously imposed. Finally, at the time Dobbert murdered his children, there was in effect a statute warning him that the crime of first degree murder could be punished by death. Whether or not the statute would withstand future constitutional attack, it clearly indicated Florida's view of the severity of murder and of the degree of punishment which the legislature wished to impose upon murderers.

Applying the reasoning in *Dobbert* to the present case, it is clear that appellant can be resentenced under the amended statute. The legislature has changed only the procedures for determining whether to impose the death penalty; the quantum of punishment and the definition of the crime remain the same. The procedural changes afford appellant significantly greater protection against the arbitrary and capricious imposition of the death penalty. Finally, at the time appellant murdered his victim, he was on notice that Idaho would seek to punish his acts with death.

"In this case, not only was the change in law procedural, it was ameliorative. It is axiomatic that for a law to be *ex post facto* it must be more onerous than the prior law." *Dobbert v. Florida, supra* at 294, 97 S.Ct. at 2299.

Although my disposition of this case would not violate the federal ex post facto clause, we are asked to construe the Idaho ex post facto clause more narrowly. The argument is that under the law in effect at the time appellant murdered his victim, he could not be constitutionally sentenced to death. Thus, it would surely violate the ex post facto clause if he were resentenced to death under procedures the legislature has mandated to conform to the requirements of the eighth amendment. This simplistic argument also ignores the purpose of the ex post facto clause.

clause bars a state supreme court from achieving the same result through judicial construction. *Bouie v. City of Columbia,* 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964).

The underlying basis for the ex post facto clause is a belief that it would be manifestly unjust to punish as criminal an act which was innocent when done. As stated by Justice Paterson in *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 396, 1 L.Ed. 648 (1798) (quoting from Blackstone):

> Here it is impossible, that the party could foresee that an action, innocent when it was done, should be afterwards converted to guilty by a subsequent law; he had, therefore, no cause to abstain from it; and all punishment when not abstaining must of consequence be cruel and unjust.

The rationale underlying the clause also prohibits statutes enhancing the punishment for a crime after its commission and statutes depriving a defendant of a defense available at the time he committed his criminal act.

At the time appellant killed his victim, he was on notice that his actions constituted the crime of first degree murder, and that the punishment for that crime could be death. The legislature has changed only the sentencing procedures by requiring that the sentencing discretion be guided and channelled rather than completely unrestrained. The purpose of the change is to provide the procedural protections required by *Furman v. Georgia, supra,* and *Woodson v. North Carolina, supra.*

Nothing I argue for today changes either the definition of the crime or the quantum of punishment attached thereto or the available defenses. I would, therefore, remand the case for resentencing under our present death penalty statute.

SHEPARD, C. J., concurs.