No. 12596

IN THE SUPREME COURT OF THE STATE OF MONTANA

1974

---

THE STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

WALLACE LLOYD RHODES, JR.,

Defendant and Appellant.

---

Appeal from: District Court of the Sixteenth Judicial District,
Honorable Alfred B. Coate, Judge presiding.

Counsel of Record:

For Appellant:

Robert J. Campbell argued, Missoula, Montana

For Respondent:

Hon. Robert L. Woodahl, Attorney General, Helena,
Montana
Thomas J. Beers, Assistant Attorney General, argued,
Helena, Montana
J. C. Weingartner, Deputy Attorney General, appeared,
Helena, Montana
William F. Meisburger, County Attorney, argued, Forsyth,
Montana

---

Submitted: April 23, 1974

Decided: JUL 19 1974

Filed: JUL 19 1974

*Thomas J. Kearney*

Clerk

No. 12597

IN THE SUPREME COURT OF THE STATE OF MONTANA

1974

---

THE STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

JAMES MARCUS SHIELDS,

Defendant and Appellant.

---

Appeal from:   District Court of the Sixteenth Judicial District,
               Honorable Alfred B. Coate, Judge presiding.

Counsel of Record:

For Appellant:

Robert J. Campbell argued, Missoula, Montana

For Respondent:

Hon. Robert L. Woodahl, Attorney General, Helena,
Montana
Thomas J. Beers, Assistant Attorney General, argued,
Helena, Montana
J. C. Weingartner, Deputy Attorney General, Helena,
Montana
William F. Meisburger, County Attorney, argued, Forsyth,
Montana

---

Submitted:  April 23, 1974

Decided:  JUL 19 1974

Filed:  JUL 19 1974

Thomas J. Kearney
                                    Clerk

Mr. Justice Wesley Castles delivered the Opinion of the Court.

This is an appeal from a judgment entered following a jury verdict of guilty of first degree murder, kidnapping and robbery. The trial judge imposed a sentence of death on the first degree murder count; a sentence of ten years on the kidnapping count; and a sentence of ten years on the robbery count; the latter two sentences to run consecutively. The judgment was the same for each of the two defendants, Shields and Rhodes, and both cases are included in this opinion.

On September 17, 1972, Donald K. Kalberg, age 48, a resident of Hardin, Montana, left his home to drive his son to Missoula to attend the University of Montana. He left his son in Missoula, but never arrived home. At a lonely highway rest stop about 21 miles east of Forsyth, Montana, the body of Don Kalberg was found in a pool of blood. He had been shot several times. His car, credit cards, and wrist watch were gone. Don Kalberg was last seen alive in his car 21 miles west of the death scene while purchasing gas in a service station in Forsyth. The two defendants were with him in his car at that time.

The two defendants, Shields and Rhodes, had escaped from jail in Mountain Home, Idaho, when they overpowered the sheriff at 9:15 a.m. on September 17, 1972, taking with them two revolvers, a .38 caliber S & W and a .357 S & W. They also took a police officer as hostage. On that same day the two defendants took by force an automobile belonging to Edward and Margaret Uffelman of Deyville, Oregon. The Uffelman automobile was found abandoned at a rest stop at Columbus, Montana. Don Kalberg's route of travel returning from Missoula to his home in Hardin would ordinarily have been through Columbus, where the Uffelman automobile was found abandoned.

Don Kalberg's stolen automobile was found abandoned at a rest stop at Emmons, Minnesota. At that rest stop, defendants

Shields and Rhodes kidnapped one Russell Batton and forced him to drive them south. Defendants were apprehended in Memphis, Tennessee. At the time of their apprehension, Shields and Rhodes had the two stolen revolvers from Mountain Home, Idaho in their possession. They also had the wrist watch, credit cards and other personal property belonging to Don Kalberg. The latent fingerprints of Shields and Rhodes were found in Kalberg's automobile at Emmons, Minnesota. The five bullets taken from the body of Don Kalberg had been discharged from the .38 S & W stolen in Mountain Home, Idaho and found in the possession of the two defendants in Memphis.

Shields and Rhodes were charged in federal court with kidnapping in respect to their abduction of hostage Batton, they plead guilty and were each sentenced to 10 years.

Shields and Rhodes had each been convicted of felonies previously; Shields of burglary and Rhodes of manslaughter. The evidence in this case is clear, convincing and beyond any doubt of a series of crimes and of a vicious, wanton, cold-blooded murder of Don Kalberg.

The district court in pronouncing judgment stated:

"Court: For the purposes of the record and before the pronouncement of sentence the court now finds that both defendants were brought to Montana for trial and under the Interstate Detainer Act by such act trial must be had within 120 days or the Information and charges must be dismissed. The defendants were brought to this court on the 2nd day of March, requested counsel, counsel was appointed. Both defendants requested that they be given a psychiatric examination. The court explained to both defendants that the 45 days for that examination would be added to the 120 days, therefore making a total time of 165 days. The trial was had, a verdict returned and this is the 211th day, with

- 3 -

15 days remaining. The court further finds that at the request of the defendants this court excluded certain items of evidence in an attempt by the court to keep the jury from being inflamed. The jury verdict is guilty on all three counts. The court has reviewed U. S. Supreme Court decision of Furman vs. Georgia and it appears to the court that any capital punishment is unconstitutional if that capital punishment is based upon race, religion, wealth, social position, class. Further, that such punishment must be acceptable to society and further the punishment must not be excessive. Both defendants this court finds are white. Both defendants are Protestant although neither practices his religion. Both defendants are destitute, however, knowledge of economics ability was not permitted to go to the jury. Both defendants are unemployed laborers. Such knowledge was not permitted to go to the jury. Both defendants have normal I. Q.'s. This knowledge was not permitted to go to the jury. Both defendants were found to have been sane. Defendant Shields was twice so found by the State of Idaho and the State of Montana. The people of this State at an election held on June 6, 1972, overwhelmingly voted for the death penalty. Both defendants have been found guilty or have entered pleas of guilty to prior criminal charges. Defendant Rhodes, involuntary manslaughter, defendant Shields, burglary. Both defendants have entered a plea of guilty to the crime of Kidnapping, subsequent to the crime herein charged. The defendants will please stand and face the court. To the crime of Murder in the First Degree I find you guilty. I find the verdict just. I have denied a motion for a new trial. I sentence you to be remanded to the custody of the Sheriff and to be executed according to the laws of this State on or before the 13th day of September, 1973. To the crime of Kidnapping the maximum punishment is 10 years. I sentence you to 10 years for that crime. To the

crime of Robbery I sentence you to 10 years for that crime. The sentences are to run consecutively and not concurrently. The County Attorney will prepare the sentence. When the sentence is prepared the court will sign it. Any other matters to come before the court?"

The appeal is brought in both cases by a single counsel, different from the separate trial counsel. Two issues are presented for review.

1. Whether or not defendants were denied fundamental due process under the Montana or United States Constitution when the district court denied their motion for a mistrial during the voir dire examination of prospective jurors.

2. Whether or not discretionary death sentences imposed pursuant to section 94-2505, R.C.M. 1947, are unconstitutional under the rule of Furman v. Georgia, 408 U.S. 238, 33 L ed 2d 346, 92 S.Ct. 2726, as the United States Supreme Court interpreted the Eighth Amendment to the United States Constitution.

As to the first issue: appellants contend that a prospective juror, Florence Fisher, had previously discussed the case with the county sheriff and made some remarks during voir dire examination to the effect that as a result of the facts given to her by the sheriff she was convinced the accused men were guilty. These alleged remarks were made before the entire jury panel and, it is contended, severely prejudiced the case. An immediate motion for mistrial was made at the suggestion of the trial judge who denied it and the trial continued.

The alleged remarks were not transcribed. But, the transcript does reveal the exchange between court and counsel out of the presence of the jury. This exchange shows that the trial judge carefully considered the matter. In the closed hearing, out of the presence of the jury, Mrs. Fisher stated she had discussed the

- 5 -

case with the sheriff at a time prior to when she was a prospective juror in the case. She stated the sheriff showed her some photographs and discussed some of the facts concerning the crime. Mrs. Fisher was challenged and did not sit on the jury.

Appellants' counsel goes to some length to reason that a small Montana community is susceptible to high emotions and such a remark on voir dire would prejudice the entire jury. This is not a sufficient showing of prejudice. See State v. Lane, 161 Mont. 369 , 506 P.2d 446, 30 St. Rep. 229; State v. Gallagher, 151 Mont. 501, 445 P.2d 45.

We find no error on the first issue.

The second issue raises squarely under the Eighth and Fourteenth Amendments to the United States Constitution the constitutionality of the death penalty as provided in section 94-2505, R.C.M. 1947, which provides in pertinent part:

"Every person guilty of murder in the first
degree shall suffer death, or shall, in the
discretion * * * of the court * * * be imprison-
ed in the state prison for the term of his natural
life * * *."

Until January 1, 1968, the jury had sentencing discretion. However in 1967, the legislature enacted into law the Criminal Procedure Act which in section 95-2212 provided that all sentences "shall be imposed exclusively by the judge of the court."

The language of section 94-2505, R.C.M. 1947, is clearly discretional and this Court so held in State v. Palen, 120 Mont. 434, 186 P.2d 223.

Appellants contend that the United States Supreme Court decision in Furman v. Georgia, 408 U.S. 238, 33 L ed 2d 346, 92 S.Ct. 2726, invalidates section 94-2505, R.C.M. 1947, as to the death penalty in Montana as being unconstitutional in violation of the Eighth and Fourteenth Amendments. The per curiam decision of the United States Supreme Court was entered in three cases, Furman

v. Georgia, Jackson v. Georgia, and Branch v. Texas, all at 408
U.S. 238, 33 L ed 2d 346, 92 S.Ct. 2726, rehearing denied, 409 U.S.
902, 34 L ed 2d 163, 93 S.Ct. 89, and stated: "The judgment in
each case is therefore reversed insofar as it leaves undisturbed
the death sentence imposed, and the cases are remanded for further
proceedings."

As revealed by the previous quoted statement of the trial
judge here in pronouncing sentence, the trial judge interpreted
Furman as forbidding the death penalty only where "capital punish-
ment is based upon race, religion, wealth, social position, class"
and where the death penalty is not "acceptable to society and * * *
is excessive."

This view of Furman is erroneous. Furman invalidates
death sentences imposed under statutes such as our section 94-2505
not because of race or economic status but because of the unfettered
discretion lodged in the judge.

We do not intend to fully analyze the Furman decision, and
the many cases in other jurisdictions. We shall only briefly dis-
cuss Furman.

Furman holds unconstitutional every death sentence imposed
pursuant to a statutory scheme that allows the sentencer discretion
whether or not to impose the death penalty upon conviction. This
is plain for several reasons.

First, the Furman opinions themselves are explicit on the
point. Although the five separate opinions written by the majority
differ in scope (for example, on the question whether the consti-
tutionality of mandatory death penalties ought to be decided or
reserved), all five justices plainly, uncontrovertibly and un-
mistakably agree that discretionary death penalties are unconsti-
tutional.

Second, Furman was explained and applied by a unanimous
court in Moore v. Illinois, 408 U.S. 786, 33 L ed 2d 706, 716,

- 7 -

92 S.Ct. 2562. In <u>Moore</u>, Mr. Justice Blackmun wrote for nine justices when he concluded that "the Court today has ruled that the imposition of the death penalty under statutes such as those of Illinois is violative of the Eighth and Fourteenth Amendments,

Furman v. Georgia./ The sentence of death * * * may not now be imposed."

Third, the <u>Moore</u> opinion merely states explicitly what an inspection of the court's June 29, 1972, order list establishes beyond peradventure. For the court on that day, simultaneously with <u>Furman</u> and upon its authority, summarily vacated death sentences in 117 other capital cases, involving numerous differing death penalty statutes from 26 states. The court thus broadly overturned the death sentences in each and every case of discretionary capital punishment before it--whether death sentencing was dependent upon the discretion of judge or jury, and without regard to the form of the statutes conferring such discretion. The court vacated death sentences where a defendant had been sentenced to death by a jury which had a choice between death and prison confinement. See: Jackson v. Alabama, 408 U.S. 938, 33 L ed 2d 757, 92 S.Ct. 2866; Morales v. Texas, 408 U.S. 938, 33 L ed 2d 758, 92 S.Ct. 2868; where the death penalty was mandatory unless the jury recommended mercy, Johnson v. Florida, 408 U.S. 939, 33 L ed 2d 762, 92 S.Ct. 2875; Eaton v. Ohio, 408 U.S. 935, 33 L ed 2d 750, 92 S.Ct. 2857, where the sentence was life unless the jury recommended death, Canaday v. Washington, 408 U.S. 940, 33 L ed 2d 764, 92 S.Ct. 2878; where the defendant was sentenced to death by a judge following a plea of guilty, Alvarez v. Nebraska, 408 U.S. 937, 33 L ed 2d 756, 92 S.Ct. 2865; Fesmire v. Oklahoma, 408 U.S. 935, 33 L ed 2d 749, 92 S.Ct. 2855; the defendant waived jury trial and was tried and sentenced by a judge, Delgado v. Connecticut, 408 U.S. 940, 33 L ed 2d 764, 92 S.Ct. 2879; Miller v. Maryland, 408 U.S. 934, 33 L ed 2d 747, 92 S.Ct. 2851; where the jury could make a binding

recommendation of death, but where a recommendation of mercy could be overridden by a judge, Seeney v. Delaware, 408 U.S. 939, 33 L ed 2d 760, 92 S.Ct. 2871; Kelbach v. Utah, 408 U.S. 935, 33 L ed 2d 751, 92 S.Ct. 2858; and where the jury could make a binding recommendation of mercy, but where a recommendation of death could be overridden by a judge, Hurst v. Illinois, 408 U.S. 935, 33 L ed 2d 749, 92 S.Ct. 2854; Strong v. Maryland, 408 U.S. 939, 33 L ed 2d 760, 92 S. Ct. 2872; Gilmore v. Maryland, 408 U.S. 940, 33 L ed 2d 763, 92 S.Ct. 2876. And the court has continued to vacate death sentences whenever capital punishment is imposed at the discretion of the sentencer. See e.g., Jackson v. Georgia, supra. Cf. Pennsylvania v. Brown, 411 U.S. 917, 36 L ed 2d 308, 93 S.Ct. 1547; New York v. Fitzpatrick, 42 U.S. L.W. 3291 (Nov. 13, 1973).

Fourth, both the majority and the minority opinions in Furman recognize that the rule of that case overturning discretionary capital punishment provisions is not limited to the statutes of the 26 states that happened to be before the court on June 29, 1972.

Fifth, the Furman decision has been widely and uniformly applied to invalidate death sentences in the lower federal courts, state trial courts, and state appellate courts. Every one of these federal and state decisions applies Furman without regard to whether the death penalty was imposed by a jury, by a judge, or by joint action of the two, and without regard to the form of the statutory authorization of death-sentencing discretion involved. All of the decisions reach basically the same conclusion: "the United States Supreme Court in Furman v. Georgia * * * has held that the carrying out of a death penalty imposed at the discretion of the trier of facts constitutes 'cruel and unusual punishment' in violation of the Eighth and Fourteenth Amendments to the United States Constitution." State v. Leigh, 31 Ohio St. 2d 97, 285 N.E.2d 333, 334. In Bartholomey v. State, 267 Md. 175, 297 A.2d 696, 701,

for example, the Court of Appeals of Maryland rejected the Attorney

General's position that the Maryland statute could escape the rule

of Furman, saying:

> "We entertain not the slightest doubt that the
> imposition of the death sentence under any of the
> presently existing discretionary statutes of Mary-
> land which authorize, but do not require, that
> penalty is unconstitutional under Furman as violative
> of the Eighth and Fourteenth Amendments to the fed-
> eral constitution.  In other words, we think the
> net result of the holding in Furman is that the death
> penalty is unconstitutional when its imposition is
> not mandatory.  See, e.g., State v. Martineau,N.H.,
> 293 A.2d 766 (1972); State v. Leigh, 31 Ohio St. 2d
> 97, 285 N.E.2d 333 (1972); Commonwealth v. Bradley,
> Pa., 295 A.2d 842 (1972).  Adams v. State, Ind., 284
> N.E.2d 757 (1972); State v. Dickerson, Del. (1972);
> Adderly v. Wainwright, F.R.D. (M.D. Fla. 1972);
> Johnson v. Warden, Md.App., 295 A.2d 820 (Post Con-
> viction) September Term, 1972 (filed October 24, 1972).
> That Furman invalidates all death penalties imposed
> pursuant to discretionary statutes is so, without
> regard to the nature of the offense, the particular
> circumstances under which the crime was committed,
> or the particular procedure followed in imposing the
> death sentence.  Indeed, included among the 120 cases
> which the Supreme Court remanded for further proceed-
> ings in light of Furman were cases involving murders
> of law enforcement officers (as in Bartholomey), mass
> killings, and aggravated rapes."

It is true that no Montana cases involving a defendant

sentenced to death were pending before the Supreme Court of the

United States at the time of Furman.  But the Court's disposition

of cases involving statutes similar to Montana's clearly controls

the issue of the constitutionality of the death sentences imposed

upon appellants in this case.

The trial court theorized that Furman was inapplicable

to these appellants because they were white, Protestant, and of

average intelligence.  However, nothing in the Furman decision

or in the cases disposed of with or after Furman indicates that

the particular circumstances of individual cases or defendants

are relevant to the Eighth Amendment invalidity of a death sen-

tence imposed under a statute providing for discretionary capital

punishment.  To the contrary, both majority and dissenting justices

in Furman emphasized that the court's ruling was not premised on

an evidentiary record which demonstrated a pattern of racial or economic or religious discrimination. In <u>Furman</u>, Mr. Justice Stewart noted that "racial discrimination [in the imposition of capital punishment] has not been proved" (408 U.S. at 310), and pointed out that the court had rejected "claims under the Due Process and Equal Protection Clauses of the Fourteenth Amentment" in McGautha v. California, 402 U.S. 183, 28 L ed 2d 711, 91 S.Ct. 1454 (408 U.S. at 310 n. 12.) Mr. Chief Justice Burger, dissenting, emphasized that "any equal protection claim is totally distinct from the Eighth Amendment question, to which our grant of certiorari was limited in these cases." (408 U.S. at 390 n. 12.)

Some of the majority justices did comment upon apparent racial discrimination in capital sentencing patterns, but their primary emphasis was on the infrequent, arbitrary, and unpredictable nature of discretionary capital punishment. It was the freakish rarity of the death penalty, making it "discriminatory" when applied to either blacks or whites, rich or poor, that violated Eighth Amendment standards. See 408 U.S. at 251 (Douglas J. concurring); 408 U.S. at 293 (Brennan J. concurring); 408 U.S. at 309-310 (Stewart J. concurring); 408 U.S. at 313 (White J. concurring); 408 U.S. at 356 (Marshall J. concurring). Mr. Justice White commented that:

> " * * * I can do no more than state a conclusion based on 10 years of almost daily exposure to the facts and circumstances of hundreds and hundreds of federal and state criminal cases involving crimes for which death is the authorized penalty. That conclusion * * * is that the death penalty is exacted with great infrequency even for the most atrocious crimes and that there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not."

This Court must follow the law of the land. We have no choice but to declare the judgment of death under section 94-2505

R.C.M. 1947, unconstitutional and thus the judgment of death invalid. The United States Constitution, as the United States Supreme Court interpreted it, gives us no latitude.

Heretofore we quoted the trial judge on the overwhelming vote of the people of Montana to retain the death penalty. Subsequently the Legislature enacted into law a mandatory death penalty. We emphasize here that this holding does not in any way purport to rule on the validity of the new statute, passed as Sec. 2, Chapter 262, Laws of 1974 (section 94-5-105, R.C.M. 1947 as amended).

The judgments of conviction are affirmed, but the sentences of death are reversed. Because the two defendants are now serving time in federal prison, and by authority of section 95-2404, R.C.M. 1947, this Court modifies the judgments by imposing sentences on each of the defendants of imprisonment in the Montana State Prison for the term of his natural life. This opinion shall constitute such judgments and verified copies shall be filed in the district court of Rosebud County.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

- 12 -