No. 14448

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

---

STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

DEWEY EUGENE COLEMAN,

Defendant and Appellant.

---

Appeal from:  District Court of the Sixteenth Judicial District,
Honorable A. B. Martin, Judge presiding.

Counsel of Record:

For Appellant:

Moses Law Firm, Billings, Montana
Charles F. Moses argued, Billings, Montana

For Respondent:

Hon. Mike Greely, Attorney General, argued, Helena,
Montana
Mike McCarter, Assistant Attorney General, argued,
Helena, Montana
John S. Forsythe, County Attorney, Forsyth, Montana

---

Submitted:  October 29, 1979

Decided:  DEC 19 1979

Filed:  DEC 19 1979

*Thomas J. Kearney*
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

On June 20, 1979, we handed down our opinion on the second appeal of Dewey Eugene Coleman (1979), ___ Mont. ____, _____ P.2d ____, 36 St.Rep. 1134. Following the opinion, we received the decision of the United States Supreme Court in Sandstrom v. Montana (1979), ____ U.S. _____, 99 S.Ct. 2450, 61 L.Ed.2d 39. Counsel for Coleman filed with us a petition for rehearing on the second appeal, alleging, among other things, that the holding in Sandstrom required a reversal and a new trial in Coleman's case. On the basis of Sandstrom, we granted the petition for rehearing, and further permitted argument on eight other grounds urged by Coleman for rehearing. The issues raised by both sides were briefed and argument was had on rehearing before us on October 29, 1979.

We now uphold the judgment of conviction against Dewey Eugene Coleman, and the sentence of death imposed on him. We will discuss our reasons under the issues as they were briefed and argued before us.

1. The effect of the Sandstrom decision.

In Sandstrom, the United States Supreme Court found the trial court's instruction "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts" unconstitutional. ___ U.S. at ____, 99 S.Ct. at 2453, 61 L.Ed.2d at 44.

The Supreme Court held that such an instruction may have been viewed by the jury as an "irrebutable direction by the court to find intent once convinced of the facts triggering the presumption. Alternatively, the jury may have interpreted the instruction as a direction to find intent upon proof of the defendant's voluntary actions, . . . unless the

-2-

defendant proved the contrary by some quantum of proof. . ."
Sandstrom, ____ U.S. at _____, 99 S.Ct. at 2456, 61 L.Ed.2d
at 47.

The instruction to which Coleman objects on the basis
of Sandstrom is the trial court's instruction no. 22 as
follows:

> "If you find that the defendant Dewey Eugene
> Coleman committed a homicide and no circumstances
> of mitigation, excuse or justification appear,
> then you may infer that the homicide was committed
> knowingly or purposely."

The objections by Coleman to instruction no. 22 may be
summarized as follows: (1) the instruction was in the
nature of a Sandstrom instruction; (2) this Court has held
that Coleman instruction is similar to the Sandstrom instruction
(State v. Sandstrom (1978), ____ Mont. ____, 580 P.2d 106, 35
St.Rep. 744); (3) under instruction no. 22 the State was not
required to prove every element of the alleged crime beyond
a reasonable doubt; (4) a statutory presumption is unconstitutional
unless it can be shown that the presumed fact is more likely
than not to flow from the proved fact upon which it depends;
(5) instruction no. 22 conflicts with the defendant's presumption
of innocence because where intent is an element of the crime
it cannot be taken from the jury through reliance on a
presumption; (6) therefore, the State was not required to
prove its case against defendant beyond a reasonable doubt.

We first note that the instruction in Coleman differs
from the instruction given on Sandstrom in that the Coleman
instruction is not mandatory in its terms. The permissive
nature of the language "you may infer" cannot be escaped.
The question then becomes whether the permitted inference,
when read with the other instructions in the case, allowed
the State to convict Coleman without proving every element
of the offenses charged beyond a reasonable doubt.

Moreover, the Sandstrom instruction related to a presumption
as a matter of law. The Coleman instruction refers to an

-3-

inference of fact, a deduction that logically could be inferred by the jury under proof of the circumstances stated. The possible inference, by its terms is not in itself unreasonable.

The United States Supreme Court said in Sandstrom that determining whether the State has been relieved of its burden of proof, "requires careful attention to the words actually spoken to the jury . . . for whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable jury could have interpreted the instruction." Sandstrom, ___ U.S. at ___, 99 S.Ct. at 2454, 61 L.Ed.2d at 45.

A review of the instructions given by the trial court shows that instruction no. 22 did not stand alone on the burden of the State to prove the elements of the offenses charged. At the outset, the Court informed the jury, "[t]he State is required to prove, beyond a reasonable doubt, all material facts alleged in the information filed in this case."

Further instructions of the court hammered home to the jury the importance of the presumption of innocence. In court's instruction no. 3, the jury was told that the defendant came into court protected by the presumption of innocence as to any crime, and particularly the crimes charged against him; that he was presumed to be innocent until his guilt is established to a moral certainty beyond a reasonable doubt; that the presumption of innocence attended him at every step and through- out the entire case and that he was entitled to the benefit of that presumption upon every question of fact; and that the jury should determine his guilt or innocence by a careful con- sideration of all the evidence introduced in the case during the trial.

In instruction no. 4, the trial court told the jury that the burden of proof rested upon the State throughout the trial to establish the guilt of Coleman beyond a reasonable doubt and that his conviction would not be warranted unless the burden was sustained.

-4-

In instruction no. 5, the jury was told the defendant in a criminal action is presumed to be innocent until the contrary is proven, and in case of reasonable doubt whether his guilt is satisfactorily shown, he was entitled to an acquittal; that the effect of this presumption was to place upon the State the burden of proving the defendant guilty beyond a reasonable doubt.

Although Coleman was convicted of three separate crimes, the disputed instruction relates only to the charge of deliberate homicide. We find that the trial court fully informed the jury in the foregoing instructions about the burden of proof resting upon the State as to each material element of the crimes charged and the abiding effect of the presumption of innocence throughout the course of the trial. We look now to determine the effect under the instructions of the language in the disputed instruction that the jury might "infer that the homicide was committed knowingly or purposely".

An inference is a form of evidence defined as "indirect evidence". Section 26-1-102(4), MCA. To a layman, perhaps, indirect evidence is better known as "circumstantial evidence".

In trial court's instruction no. 8, the jury was instructed that there were two classes of evidence upon either or both of which if adequately convincing, the jury might lawfully find the accused guilty of crime. One was direct evidence, and the other was circumstantial evidence. A part of the court's instruction no. 8 with respect to circumstantial evidence told the jury:

> "All other evidence admitted in the trial is
> circumstantial, and insofar as it shows any
> acts, declarations, conditions, or other
> circumstances tending to prove a crime in
> question, it may be considered by you in
> arriving at a verdict. Either will support
> a verdict of guilty if it carries the convincing
> quality required by law, as stated in these
> instructions. However, you are instructed
> that you are not permitted on circumstantial

-5-

evidence alone to find the defendant guilty of any crime charged against him unless the proved circumstances not only are consistent with the hypothesis that the defendant is guilty of the crime but are inconsistent with any other rational conclusion."

When we give careful attention to the words spoken to the jury, as the United States Supreme Court said in Sandstrom, the foregoing instruction with respect to the effect of circumstantial evidence must be weighed with the disputed instruction that the jury "may infer" material elements of the crime. On balance, it is clear to us that the permissive language in the disputed instruction must under any fair reading give way to the positive declaration in instruction no. 8 that circumstantial evidence must carry the convincing quality required by law as stated in the instructions, and that any such inference standing alone would be insufficient unless it was inconsistent with any other hypothesis than guilt.

On appeal, we view the instructions as a whole. State v. Farnes (1976), 171 Mont. 368, 558 P.2d 472. It is impossible to deliver the whole of the law in any one instruction, and for that reason, all instructions are considered as a whole and if they fairly tender the case to the jury, the fact that one instruction standing alone is not as full or accurate as it might be is not reversible error. State v. Caryl (1975), 168 Mont. 414, 543 P.2d 389. The purpose to commit a crime, or knowledge that one is committing a crime, are subjective matters that most often can be proven only through circumstantial or indirect evidence.

The holding in Sandstrom is not to be construed to mean that whenever a trial court instructs the jury that it may resort to inference to determine subjective matters such as knowledge or purpose, that thereby the State has been relieved

of its burden of proof. The United States Supreme Court did not intend such limitation, and we do not find any such intention in the language of Sandstrom, or its related cases. The jury was not allowed to rest solely upon the permitted inference in the Coleman case, but under the instructions had to require such an inference to meet the standard as beyond a reasonable doubt.

The true test under Sandstrom, in determining the effect of an instruction such as the one disputed here is whether that instruction has the effect of allocating to the defendant some part of the burden of proof that properly rests on the State throughout the trial. See Holloway v. McElroy (D. Ga. 1979), 474 F.Supp. 1363, 1368. We do not find that to have occurred here.

On that basis we distinguish the Coleman instruction from those cases involving a burden-shifting presumption as in Mullaney v. Wilbur (1975), 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508; and conclusive presumptions like those involved in Sandstrom, supra; Morissette v. United States (1952), 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288; and United States v. United States Gypsum Co. (1978), 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854. Instead the inference is purely permissive, in the sense described in County Court of Ulster Cty. v. Allen (1979), ___ U.S. _____, 99 S.Ct. 2213, 60 L.Ed.2d 777.

Coleman further contends that because we stated in our first Sandstrom opinion (State v. Sandstrom (1978), ____ Mont. _____, 580 P.2d 106, at 109, 35 St.Rep. 744, at 748) that the instruction in Coleman was similar to the Sandstrom instruction that thereby the United States Supreme Court in overruling Sandstrom has in effect determined that the Coleman instruction was likewise unconstitutional. We do not accept that contention as having any validity. Comparing each instruction,

-7-

we see this manifest difference: the _Sandstrom_ instruction is by its terms mandatory but the _Coleman_ instruction is permissive. We can see no other construction as to the effect of the language used in instruction no. 22 in this _Coleman_ case.

2. The effect of the instruction on "knowingly."

Here Coleman attacks the definition of the term "knowingly", as given by the Court in instructing on that element regarding the crimes charged.

In trial court's instruction no. 26, the jury was told:

> "'Knowingly'. A person acts knowingly with respect
> to conduct or to a circumstance described by a
> statute defining an offense when he is aware of
> his conduct or that the circumstance exists. When
> knowledge of the existence of a particular fact
> is an element of an offense, such knowledge is
> established if a person is aware of a high probability
> of its existence. Equivalent terms such as 'knowing'
> or 'with knowledge' have the same meaning."

The objections to this instruction on rehearing are: (1) it violates the rule against reasonable doubt because it requires only a "high probability of its existence;" (2) it is in effect an exclusive presumption in that the element is established if the jury finds a high probability of its existence; and (3) "high probability" does not have that quality which would enable a jury to convict.

Under United States v. United States Gypsum Co., supra, where a defendant's state of mind or intent was an element of an antitrust offense, a reliance by a jury on a legal presumption of wrongful intent from proof or effect on prices necessitated reversal. Applying the rationale of United States Gypsum Co., defendant contends that Montana's statutory definition of "knowingly" is established if a jury finds "a high probability of its existence". This, Coleman contends, does not equate with proof beyond a reasonable doubt as an essential element of the crime charged.

-8-

In the original <u>Coleman</u> opinion from this Court, (1978), ___ Mont. _____, 579 P.2d 732, 35 St.Rep. 560, we considered this argument.  There we rejected the contention. Consideration by us of the renewed issue on rehearing is proper, since it was not addressed in our second <u>Coleman</u> opinion of June 20, 1979, supra, and the <u>Sandstrom</u> decision intervened between our said decision and the rehearing.

The statute on which the instruction is based, section 45-2-101(27), MCA, defines "knowingly" as follows:

> "'Knowingly'--a person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when he is aware of his conduct or that the circumstance exists.  A person acts knowingly with respect to the result of conduct described by a statute defining an offense when he is aware that it is highly probable that such result will be caused by his conduct.  When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person is aware of a high probability of its existence. Equivalent terms such as 'knowing' or 'with knowledge' have the same meaning."

The statute considers two elements of knowledge as far as this case is concerned, (1) knowledge as to the conduct itself and, (2) knowledge as to the result of that conduct.  It is only the <u>result</u> of the conduct that hangs on the proof of his awareness that "it is highly probable that such result [would] be caused by his conduct."

The evil countermanded in <u>Sandstrom</u> and again in <u>United States</u> <u>Gypsum</u> <u>Co.</u>, is instructing the jury in such a manner that the function of fact-finding is invaded by the court.  It is when the instructions take away from or intrude upon the duty of the jury to find intent that the instruction becomes con-stitutionally impermissible for "'A conclusive presumption [of intent], which testimony could not overthrow would effectively eliminate intent as an ingredient of the offense.'"  483 U.S. at 446, 98 S.Ct. at 2878; <u>Morissette</u>, 342 U.S. at 275, 72 S.Ct. at 256.

-9-

When the holdings in Sandstrom and United States Gypsum Co. are understood in that context, one may examine the instruction on "knowingly" complained of here, and determine that the fact-finding duty of the jury is not invaded by the Court. The District Court is not usurping a jury function when it instructs "a person acts knowingly with respect to the result of conduct [constituting a crime] when he is aware that it is highly probable that such result [would] . . . be caused by his conduct." The jury is not called upon to determine "high probability" in place of "reasonable doubt"; rather it is called on to determine the existence of defendant's awareness, beyond a reasonable doubt, that a high probability is that the result of his conduct makes his conduct criminal. The District Court here did not, by using this instruction, make it mandatory upon the jury to find defendant's awareness, nor conclusively presume his awareness. That finding was left exclusively to the jury. In short, the instruction did not establish a presumption which testimony could not overthrow. On that basis, therefore, we find no merit on the second ground of attack.

Montana has the right and authority to define crimes and their elements. See Patterson v. New York (1977), 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281. It is consistent with modern concepts of intent to define knowledge as an awareness of probable consequences. The United States Supreme Court said in United States v. United States Gypsum Co., supra, 438 U.S. at 444-45, 98 S.Ct. at 2877, with respect to intent under antitrust laws:

> ". . . we conclude that action undertaken with knowledge of its probable consequences and having the requisite anticompetitive effects can be a sufficient predicate for a finding of criminal liability under the antitrust laws.

> "Several considerations fortify this conclusion. The element of intent in the criminal law has traditionally been viewed as a bifurcated concept

embracing either the specific requirement of
purpose or the more general one of knowledge
or awareness.

> "'[I]t is now generally accepted that
> a person who acts (or omits to act) intends
> a result of his act (or omission) under two
> quite different circumstances: (1) when
> he consciously desires that result, whatever
> the likelihood of that result happening
> from his conduct; and (2) when he knew
> that the result is practically certain to
> fall from his conduct, whatever his desire
> may be as to that result.' (Citing authority.)

"Generally this limited distinction between knowledge
and purpose has not been considered important since
'there is good reason for imposing liability whether
the defendant desired or merely knew of the practical
certainty of the result.' (Citing authority.) In
either circumstance, the defendants are consciously
behaving in a way the law prohibits, and such conduct
is a fitting object of criminal punishment. (Citing
authority.)"

3. Distinction Between Ex Post Facto and Retroactive
Restrictions.

Nothing in the briefs or on the rehearing has been brought
to our attention requiring us to expand our discussion of these
issues in our opinion promulgated June 20, 1979, except for
the citation by Coleman of State v. Collins (La. 1979), 370
So.2d 533, and Miller v. State (Tenn. 1979), 584 S.W.2d 758.

In State v. Collins, the Louisiana Court decided, on
retroactive grounds, without specific reference to ex post facto
effect, that the application of the death penalty was barred by a
Louisiana statute similar to that of Montana, that no section
of the revised statutes is retroactive unless expressly so
stated. The defendant there committed the offense of first degree
murder at a time when the first degree murder statute provided
that whoever committed the offense must be punished by death.
Following the United States Court decision in Roberts v.
Louisiana (1976), 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974,
Louisiana enacted new statutes effective 21 days after the
offense here was committed, "redefining the crime of first

degree murder and enacting a permissive, and presumably con-
stitutional, death penalty. . ." 370 So.2d at 534. It appears
therefore that Louisiana not only redefined the punishment
for murder, but redefined the crime. In Montana, the legislature
took only the procedural step of redefining the punishment.
On that basis, as our earlier discussion respecting ex post
facto and retroactive provisions disclose, State v. Collins is
distinguishable from the case at bar.

Similarly, there is a distinguishing factor in Miller v.
State, supra. The Tennessee constitution has a provision which
states:

> "That laws made for the punishment of acts
> committed previous to the existence of such laws,
> and by them only declared criminal, are contrary
> to the principles of a free government; wherefore
> no Ex post facto law shall be made." 584 S.W.2d
> at 761.

It is obvious that the Tennessee court, under that State con-
stitutional provision, could only decide that laws providing
for punishment but enacted after the crime could not be retro-
actively applied.

It should be noted that the Tennessee court in Miller
agreed with our determination of the effect of Calder v. Bull
(1798), 3 U.S. (3 Dall.) 386, 1 L.Ed. 648, as to retroactivity
and the four broad classifications of ex post facto laws
set out in State v. Rowe (1935), 116 N.J.L. 48, 181 A. 706.
See 584 S.W.2d at 761.

We note in passing that in Smith v. Com. (Va. 1978),
248 S.E.2d 135, where Virginia's 1975 death penalty statute
was presumptively valid in spite of the United States Supreme
Court decisions attacking the constitutionality of similar death
penalty statutes and a 1977 Virginia law amending the death
penalty statute was applied to uphold a previous death penalty;
the Virginia Court found that the 1977 changes were ameliorative.
It found so because the 1977 law provided an alternative penalty

provision instead of the mandatory penalty provision of the 1975 law. This was the same situation as occurred in Montana. Relying on Dobbert v. Florida (1977), 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344, the Virginia Supreme Court found no ex post facto violations since the defendant had "'fair warning' of the consequences of murder." 248 S.E.2d at 147. The Virginia court found that the changes were ameliorative, and merely procedural.

Since we find no compelling reason to reverse our opinion respecting the application of the 1977 Montana death statute, we hold to what we said on that subject in the opinion promulgated on June 20, 1979.

4. The New Montana Capital Punishment Statutes are Unconstitutional.

The force of Coleman's argument here is that section 46-18-305, MCA, formerly section 95-2206.10, R.C.M. 1947, provides that the sentencing court, in a death penalty case, can only consider those "mitigating circumstances sufficiently substantial to call for leniency." Coleman contends that such language limits the court's discretion only to circumstances "sufficiently substantial" and is not within the holding in Lockett v. Ohio (1978), 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973, that the sentencing body must not be precluded from considering any aspect of the defendant's record or character as a mitigating factor.

To state the converse of Coleman's position on this issue is to refute the argument. A sentencing court should not rely on "mitigating circumstances sufficiently substantial to call for leniency." The only limit placed upon the court's discretion under section 46-18-305, MCA, is that the mitigating factor must be substantial; that is, it must have some substance or weight. We cannot regard the statutory language requiring a sufficiently substantial mitigating factor as a limiting encroachment

-13-

upon the discretion of the judge when he passes sentence in capital cases.

5. <u>Whether Coleman's Death Sentence is Disproportionate to His Crime, What is the Scope of this Court's Review, and Coleman's Request for a Further Review of Comparative Cases.</u>

We lump the foregoing issues raised on the petition for rehearing together because they can be more easily answered as one subject.

First we refer again to the developments that occurred after the decision in Furman v. Georgia (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, wherein it was held that a statutory system which allows the sentencing authority unbridled discretion in the process of imposing the death penalty violated the Eighth and Fourteenth Amendments.

It was the <u>Furman</u> decision that brought about eventually the recodification of Montana's law so as to replace the mandatory death penalty with sentencing provisions which gave the sentencing judge alternatives to follow in pronouncing sentence. Under Jurek v. Texas (1976), 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929; Proffitt v. Florida (1976), 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913; and Gregg v. Georgia (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859, it/is clear that <u>Furman</u> does not require that all sentencing discretion of the trial court be eliminated if the statutory system provides adequate standards to guide the exercise of the discretion in sentencing in capital cases.

Montana's response was the adoption of sections 46-18-301-310, MCA, inclusive. Those sections guide the discretion of the District Court both as to aggravating circumstances and mitigating circumstances in passing sentence. The District Court may impose its sentence of death if it finds one or more of the aggravating circumstances described and also finds there are no mitigating circumstances sufficiently substantial to call for

-14-

leniency. Findings of fact are required of the District Court and automatic review by the Supreme Court in all death sentences is also provided.

The duties of our Supreme Court with respect to death sentences is set forth in section 46-18-310, MCA. Under that statute, this Court shall determine:

> "The supreme court shall consider the punishment as well as any errors enumerated by way of appeal. With regard to the sentence, the court shall determine:
>
> "(1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
>
> "(2) whether the evidence supports the judge's finding of the existence or nonexistence of the aggravating or mitigating circumstances enumerated in 46-18-303 and 46-18-304; and
>
> "(3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. The court shall include in its decision a reference to those similar cases it took into consideration."

Coleman makes two arguments respecting our review, (1) that we have not reviewed the "entire record" under section 46-18-308, MCA, because we have not reviewed, Coleman contends, the issues raised on his first appeal and (2) that we have not reviewed all the appropriate "similar cases" under section 46-18-310(3), MCA.

Needless to say, when the matter came to this Court for automatic review after the death sentence was reimposed, there came with it not only the record of the resentencing, but the entire record of the trial. We also had before us the briefs and records that related to the first opinion. It should be understood, therefore, that in connection with the second opinion promulgated June 20, 1979, supra, that we have in fact reviewed the entire record.

-15-

Further we see no reason to change our position with respect to the similar cases that we looked at in order to determine whether or not the death sentence in Coleman's case was disproportionate. We take our duty to be, in connection with whether a death sentence is disproportionate, that we should review the circumstances of the crime of which the defendant is accused, and in the light of those circumstances, the judgment and the sentence thereupon imposed; and, examine cases involving similar crimes, all for a single purpose, to make certain that as far as the defendant in this case, Coleman, is concerned, there has been no discriminatory action on the part of the sentencing judge, no abuse of discretion by the sentencing judge, and that the sentencing judge has considered and applied fairly and without discrimination the applicable law. We find this to be true in this case. It should be understood that in the final analysis, the imposition of sentence is not one that this Court must undertake. That matter is still reserved under our statutes to the District Courts. There is a discretion vested in the District Court in capital cases as to whether the death penalty should be imposed. Once that discretion has been exercised, and if we find that it has been exercised fairly, indiscriminately and in accordance with the applicable statutes, then it must be upheld. The search for disproportionateness involves elements that consider the gravity of the crime, the brutality with which it may have been committed and the factors, if any, which lead to a call for leniency. We look for the even-handed application of death sentences without regard to sex, color, creed, or race, or any other discriminating consideration. When we find that this has occurred, as we find here, our course under the law is to uphold the decision of the District Court.

6. Hanging as Cruel and Unusual Punishment.

Coleman's contention here is that hanging, even if carried out exactly, so that death results from a broken neck, is cruel

-16-

and unusual punishment.

The State responds that there is no evidence in this case that shows that death from hanging, when properly carried out, is anything other than swift and immediate, or that hanging results in any more suffering than that associated with electrocution or other modes of execution.

Hanging is the only kind of execution provided by Montana statutes. The legislature has not seen fit to change it, although several attempts in recent years have been made to eliminate capital punishment altogether. In that limited sense, the legislature has made a choice to continue the present provisions. We have no power to change these settled provisions of the law, nor can we say that hanging is constitutionally cruel and unusual.

7.  Disposition.

This opinion in addition to our opinion handed down June 20, 1979, constitutes our decision in this case.

Let remitittur be issued from this Court to the District Court for the purpose of resetting the execution date,/complying
                                                      and
with our opinion and order promulgated June 20, 1979.

_____
                              Justice

We Concur:

_____
          Chief Justice

_____

_____
                Justices

-17-

Mr. Justice Daniel J. Shea concurring in part and dissenting in part:

I concur in the conclusion reached by this Court that the so-called Sandstrom-type instruction given in this case was not error. As the Court reasons, the instruction is substantially different than that which was given in the Sandstrom case. On the other hand, I do not believe that it was a model instruction which should be given as a matter of course in criminal trials.

One of the reasons this Court granted defendant's petition for rehearing was to consider the impact of the decision of the United States Supreme Court in Sandstrom v. Montana (1979), _____ U.S. _____, 99 S.Ct. 2450, 61 L.Ed.2d 39. We have, moreover, since hearing this case on the petition for a rehearing, concluded that defendant Sandstrom is entitled to a new trial based on the opinion of the United States Supreme Court that we cannot do otherwise unless we find that beyond a reasonable doubt, the error is harmless. Using that standard, we could not determine that the error in giving the instruction was harmless. State v. Sandstrom (1978), _____ Mont. _____, 580 P.2d 106, 35 St.Rep. 744. We therefore ordered a new trial.

Although the instruction given in defendant Coleman's case was not a Sandstrom-type instruction, I believe that the court has omitted the strongest fact as to why the instruction, even assuming it was a carbon-copy of that given in Sandstrom, was harmless error. The simple fact is that defendant Coleman testified/ that he was not present during the homicide; he had nothing to do with it; and, indeed, that he did not know that Nank planned to kill Miss Harstad. In essence, the defense was alibi. In Sandstrom, on the other hand, the defendant admitted the killing, but his defense was that he did not intend to kill. There is a world of difference in these two defenses

-18-

and so is there a world of difference as to the potential impact of a Sandstrom-type instruction.

In the Coleman case, Nank testified in lurid detail concerning his and defendant Coleman's plan to kidnap, rape, and kill Miss Harstad.  The jury was thus given two clear choices: To believe Coleman's alibi defense and thus conclude that Nank alone planned to and killed Miss Harstad; or, on the other hand, to believe Nank's testimony which implicated Coleman in a deliberate design to kidnap, rape, and kill Miss Harstad.  Nank's testimony, combined with the corroborating evidence implicating Coleman in the crimes involved, is sufficient beyond a reasonable doubt, to permit a jury conclusion that Coleman was guilty of the crimes for which he was convicted.  Under these circumstances, once the jury chose to believe Nank (which, of course, also implies a determination that Coleman was lying), no presumption or no inference was needed to help the prosecution's case along. For this reason, I have no trouble in concluding that even if the instruction was a carbon-copy of that instruction forbidden by the Sandstrom case, the error, beyond a reasonable doubt, was harmless.

The majority has imbellished to an extent upon its original opinion concerning the other issues decided in the original case, and I emphasize that I do not agree with these statements and conclusions.

In the last paragraph of its opinion here, the Court has stated that its Opinion dated June 20, 1979, together with the Opinion issued today, shall constitute the opinion in this case. I dissented to that majority opinion and I state  here that such dissent shall also constitute my views on the questions surrounding the imposition of the death penalty in this case.  Nank's bargain with the State saved his own life; but this very same

-19-

bargain sealed Coleman's date with the executioner.  No court should sanction such disparate results arising from the commission of the same crimes.  The tragedy of the senseless killing perpetrated by Nank and Coleman is only compounded by the senseless killing of Coleman which this Court has today sanctioned.

_____
                    Justice